[No. A125732. First Dist., Div. Two. May 5, 2011.]

BENJAMIN, WEILL & MAZER, Plaintiff and Respondent, v.
NANCY HURWITZ KORS, Defendant and Appellant.

## Counsel

Gary Steven Garfinkle and Maria Garfinkle for Defendant and Appellant.

Benjamin, Weill & Mazer, Andrew J. Weill, David R. Benjamin and Kenneth D. Schnur for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—This case involves a fee dispute between a law firm, respondent Benjamin, Weill & Mazer, a professional corporation (BWM), and its former client, appellant Nancy Hurwitz Kors. After Kors refused to pay the full amount billed her, BWM sued her for breach of the parties' fee agreement. Based on the arbitration clause in the agreement, Kors moved to compel arbitration under the California Arbitration Act (CAA) (Code Civ. Proc., § 1280 et seq.).[1] The court granted the motion and directed binding arbitration pursuant to the rules of the Bar Association of San Francisco (BASF). After the arbitrators ruled in its favor, BWM petitioned the court to confirm the award. Opposing the petition, Kors moved to vacate the award due to the chief arbitrator's failure to disclose "matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial," as required by the CAA (§ 1281.9, subd. (a)). The trial court denied Kors's motion and confirmed the award. Kors appeals from that ruling.

As originally briefed, the questions presented on appeal were whether the trial court erred in rejecting Kors's claim that section 1281.9 required the chief arbitrator to disclose certain business relationships and in denying her request for attorney fees incurred in enforcing the parties' arbitration agreement. As in the trial court, the only question the parties addressed with respect to disclosure was whether the matters Kors pointed to were required to be disclosed under section 1281.9.

The fundamental problem in this case, however, arises from an internal inconsistency in the arbitration clause, which states that "[a]ny dispute pertaining to the fees owed under this agreement . . . shall, to the extent permitted by law, be submitted to binding arbitration pursuant to the rules of the Bar Association of San Francisco, and shall take place in San Francisco." While the duty to arbitrate imposed by this provision is enforceable under the CAA (§ 1281), and was enforced by the trial court under that act, the arbitration process it mandates is not that contemplated by the CAA, but the different process prescribed by bar association rules promulgated under the Mandatory Fee Arbitration Act (MFAA) (Bus. & Prof. Code, § 6200 et seq.). Under the MFAA and the BASF Rules of Procedure, Attorney/Client Fee Disputes, Arbitration and Mediation (rev. Apr. 30, 2007) (BASF Rules), a law firm cannot require a client to submit to binding arbitration to resolve a

---

[1] Code of Civil Procedure section 1281 provides: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract."

All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

fee dispute before the dispute arises, as was done in this case. (Bus. & Prof. Code, § 6204, subd. (a); BASF Rules, rule 4.A.2.) Furthermore, the MFAA and BASF Rules do not appear to require arbitrators to make the disclosure mandated by section 1281.9. The briefs of the parties and our initial opinion did not adequately address these issues.

Before our initial opinion became final, we ordered rehearing on our own motion and directed the parties to file supplemental briefs on the applicability of the CAA disclosure requirement set forth in section 1281.9 to the arbitration in this case. Kors continued to maintain that that statute applied because the arbitration was under the CAA, and that it, or the standard it codifies, should apply in MFAA arbitrations as well. Kors pointed out that throughout the trial court and appellate proceedings related to her claim of nondisclosure, BWM had consistently acknowledged application of the CAA; the legal dispute was simply whether the chief arbitrator failed to provide the disclosure required by the CAA in section 1281.9, not whether section 1281.9 applied. BWM, however, changed its position, arguing for the first time that section 1281.9 cannot be applied to the arbitration conducted by BASF.[2] BWM now argues that the arbitration was governed by the MFAA, not the CAA; that section 1281.9 does not apply in an MFAA arbitration; and that "Kors is estopped from challenging the consequences of the rules she deliberately chose" by moving to compel arbitration pursuant to the parties' agreement. In response to our request for further briefing on the propriety of submitting this dispute for arbitration under BASF Rules, Kors argues that the portion of the arbitration provision calling for binding arbitration under the CAA should be enforced, but not the portion requiring arbitration under BASF Rules. BWM contends the arbitration provision is enforceable in its entirety and, in any event, any error by the trial court was invited by Kors and waived by her participation in the arbitration.

We shall conclude that the arbitration agreement is enforceable under the CAA and the trial court erred in directing arbitration pursuant to a process governed by the MFAA. In the circumstances of this case, Kors had the right to the disclosure required by section 1281.9. Because the trial court's order for binding arbitration under BASF Rules erroneously deprived Kors of that right, we shall reverse the order confirming the arbitration award.

Kors also appeals from the order denying her request for an award of reasonable attorney fees for enforcing the arbitration agreement. We shall

---

[2] In opposing Kors's motion to compel arbitration, BWM did argue that the arbitration provision in the retainer agreement made the MFAA, rather than the CAA, the applicable law. When Kors raised the disclosure issue in challenging the arbitrator's award, however, BWM never suggested section 1281.9 did not apply, nor did it do so in its respondent's brief on appeal.

conclude that this order was also erroneous and remand the matter to the trial court with directions to grant Kors's request for reasonable fees incurred in enforcing the arbitration clause of the fee agreement, in this court as well as in the superior court.

## FACTS AND PROCEDURAL HISTORY

*The Arbitration*

In June 2004, Kors, a psychologist who serves as a professional adoption facilitator, was sued by Alette and Robert Temple after they learned that the putative birth mother they met through Kors had feigned her pregnancy and defrauded them out of several thousand dollars. In December 2004, Kors retained BWM to represent her. Five months later, after the parties clashed over a series of discovery and other disputes, the Temples voluntarily dismissed their complaint against Kors without prejudice. Kors thereafter filed a motion for an award of $224,564.74 in legal fees and costs under Family Code former section 8635, asserting that, by virtue of the dismissal, Kors was the prevailing party for purposes of that section. The trial court disagreed and denied the motion, and that ruling was affirmed by Division One of this court. (*Temple v. Kors* (Aug. 29, 2006, A112619) [nonpub. opn.].)

Kors had by that time paid BWM $227,537.75 in fees and costs, but had failed to pay a balance of $68,986.38 she had been billed by the firm. In March 2006, BWM served on Kors a notice of client's right to arbitration under the MFAA. Kors applied for nonbinding fee arbitration under the MFAA pursuant to rules of the Contra Costa County Bar Association (CCCBA). BWM objected on the jurisdictional ground that no attorney who provided services to Kors in the Temple lawsuit ever maintained an office in Contra Costa County, also noting that Kors's fee agreement with BWM specified that any fee dispute between the parties was to be resolved pursuant to the rules of the BASF. The CCCBA denied jurisdiction and, on May 1, 2007, BWM commenced this action for breach of contract in the Contra Costa Superior Court, seeking damages in the amount of $68,986.38.

Kors asked BWM to dismiss or stay the action and proceed to binding arbitration under the fee agreement. After BWM refused, Kors moved to enforce the arbitration clause under the CAA (§ 1281). BWM opposed the motion, arguing that Kors's effort to commence nonbinding arbitration pursuant to the MFAA and rules of the CCCBA waived any belated request for binding arbitration under the CAA. Rejecting this argument, the trial court reasoned that Kors's conduct "resulted only in waiver of [her] right to non-binding arbitration under the [MFAA]. [Kors] retained her right to enforce the parties' agreement for binding contractual arbitration under the CAA."

On September 28, 2007, the court granted the motion to compel arbitration and directed the parties to promptly submit their dispute to the BASF "for binding contractual arbitration under BASF's Rules of Procedure for the arbitration of attorney/client fee disputes." The order states: "BASF has jurisdiction to conduct the arbitration, and the Court is unaware of any reason why BASF would decline to exercise that jurisdiction."

On October 23, 2007, Kors moved for attorney fees for services to enforce the arbitration agreement. Relying on *Acosta v. Kerrigan* (2007) 150 Cal.App.4th 1124 [58 Cal.Rptr.3d 865] (*Acosta*), she claimed immediate entitlement to such fees regardless of the outcome of the arbitration. The trial court denied the motion.

In December 2007, the BASF appointed a panel of three arbitrators, designating Sean M. SeLegue chief arbitrator.[3] Under BASF's Rules, the chief arbitrator "shall be responsible for the conduct of the arbitration and the writing of the Arbitration Award." (BASF Rules, rule 7.D.) Also, the chief arbitrator "shall be the sole judge of the relevance of any offered evidence and the hearing procedures employed." (BASF Rules, rule 9.E.)

The panel heard the matter on September 4, 2008, but did not issue its decision until February 25, 2009, 174 days later. The panel found "that the total amount of fee[s] and/or costs which should have been charged in this matter is $303,579.34, of which the client has paid $227,537.75, for a net amount of $76,041.59 in unpaid fees and costs." (Fn. omitted.)[4] Kors was also directed to pay $26,245.80 in accrued interest, so that the total award to BWM was in the amount of $102,287.39. Together with the previously paid $227,537.75, the total cost to Kors of BWM's representation was $329,825.14 plus accruing interest on the unpaid portion. Although the 20-page arbitration award acknowledged Kors's timely complaints that the

---

[3] Under the BASF Rules, arbitrators are selected by the chair of the Attorney Fee Dispute Executive Committee (BASF Rules, rule 1.B) from a list maintained by the committee "based upon relevant factors including availability; experience; complexity of the case; and any Client request . . . for an Arbitrator who practices civil or criminal law." (BASF Rules, rule 7.A.) The rules also provide that "[i]n cases in which the amount in controversy is $10,000 or more, and the Client has agreed to Binding Arbitration, a Panel of three (3) Arbitrators shall be appointed to hear the case, one of which is not an attorney. Notwithstanding the amount in controversy, the parties may agree to have the matter heard by one (1) Arbitrator. That Arbitrator shall be an attorney." (BASF Rules, rule 7.B.2.) In all cases assigned to a three-member panel, BASF staff "shall appoint one (1) Attorney member as Chief Arbitrator. The Chief Arbitrator shall have an equal vote with the other members of the Panel but shall be responsible for the conduct of the Arbitration and the writing of the Arbitration Award." (BASF Rules, rule 7.D.)

[4] The panel thus concluded that the amount of fees and costs that should have been charged Kors was exactly the amount BWM claimed: $306,749.22. The panel reduced that amount to $303,579.34 only because Federal Express and Westlaw charges in the respective amounts of $55.88 and $3,114 were deducted from the amount of the award.

aggressive strategy BWM devised was costing more than she was able to pay, and she was afraid to tell the partner of the firm representing her that he "was on the wrong course," because she feared " 'he would go ballistic,' " the award nevertheless concluded that "while the overall total of BWM's fee claim does indeed seem high, the fees are not out of character with the stakes or the complexity of the legal and factual issues. . . . Dr. Kors persisted in her quest against the Temples even as BWM warned Dr. Kors that she was digging herself in deeper with no guarantee of a fee recovery from the Temples."

On February 25, 2009, BASF mailed Kors the award together with a notice that she had 100 days within which to request that the award be vacated or corrected, as required by section 1288.2.

*Trial Court Proceedings*

On March 13, 2009, BWM filed a petition in the pending superior court action to confirm the award. On April 1, BWM submitted a proposed judgment confirming the award, representing that Kors had not responded and the time within which she was required to do so had expired. (See § 1290.6.) The court signed the judgment, which was thereafter entered. Kors moved to vacate the judgment and sought leave to file a response to the petition to confirm, arguing that BWM had failed to give notice of the time for a response to its petition. Kors also asked the court to vacate the arbitration award due to the arbitrator's nondisclosure. Over BWM's objection, on May 22, the court vacated the judgment on the ground that BWM had failed to serve Kors notice of a hearing on its petition to confirm, as required by section 1290.4. Kors's request to vacate the arbitration award was denied without prejudice.

The parties then filed briefs on BWM's petition to confirm and Kors's request to vacate or correct the award. Though she also raised other issues,[5] Kors's request to vacate rested primarily on the chief arbitrator's asserted failure to disclose "matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial," as required by section 1281.9, subdivision (a). Kors relied upon section 1286.2, subdivision (a)(6)(A), which, as material, provides that "the court shall vacate the award if the court determines [that] [¶] . . . [¶] (6) An arbitrator making the award . . . (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware . . . ."

---

[5] Namely, that the arbitrators (1) delayed the arbitration award for 174 days, far beyond the "objective" of the BASF Rules that the award issue no later than 45 days after the matter is submitted; (2) improperly refused to hear material evidence; and (3) "failed to address the pertinent issues."

Kors's nondisclosure claim was based upon information her counsel obtained shortly after issuance of the arbitration award. In April 2009, while reading the recent opinion of the Supreme Court in *Schatz v. Allen Matkins Leck Gamble & Mallory LLP* (2009) 45 Cal.4th 557 [87 Cal.Rptr.3d 700, 198 P.3d 1109] (*Schatz*), Kors's counsel "fortuitously" noticed that SeLegue, the chief arbitrator, was counsel for the defendant law firm in *Schatz*, which was challenging the denial of its petition to compel arbitration of a fee dispute with a client. Making further inquiry, Kors's counsel learned that SeLegue had represented the law firm in *Schatz* since at least February 2006, and had filed a brief in the Supreme Court shortly before his appointment as chief arbitrator in the present case. Shortly after he filed the *Schatz* brief, nine prominent law firms entered the case as amici curiae in behalf of SeLegue's client. SeLegue personally argued the case in the Supreme Court six days after he presided over the arbitration hearing in this case. Kors's counsel also learned that during December 2008, while he was writing the award in this case, SeLegue filed petitions for writs of mandate in behalf of another large law firm, DLA Piper US, LLP, in an action against it for attorney malpractice and related torts.

As an exhibit to her request to vacate the arbitration award, Kors produced a description of SeLegue's legal practice set forth on his law firm's Web page. The description states, among other things, that "[a]ttorneys who face charges of misconduct . . . often turn to Mr. SeLegue and his colleagues," and that "[h]is business litigation background and extensive experience with the unique issues and dynamics involved in claims against lawyers allow him to provide effective representation of his clients, which include some of the nation's largest law firms."

BWM's response to Kors's nondisclosure claim argued that Kors could not sustain her burden of proving bias. BWM's brief maintained that SeLegue's failure "to disclose that he was representing a prominent law firm in an attorney-client fee arbitration dispute" cannot, "under any stretch of the imagination, be considered a matter for disclosure" under section 1281.9. BWM argued, "Dr. Kors'[s] claim reduces to nothing more than an argument that any attorney who represents law firms should be considered biased in favor of law firms. If accepted, the result would be that all attorneys who represent major law firms are disqualified from arbitrating fee disputes," and "[n]othing in reason or law supports the argument."

Prior to the hearing and on the basis of the briefs, the court issued a tentative ruling granting BWM's petition to confirm and denying Kors's requests to vacate or correct the award. After Kors indicated her unwillingness to accept the tentative ruling, a brief hearing was held on July 10, 2009, and the court issued an order adopting the tentative ruling. A timely notice of appeal was filed on July 13, 2009.

## STANDARD OF REVIEW

The appeal from the superior court's decision on an award challenged due to the arbitrator's alleged failure to disclose circumstances creating an appearance of partiality presents a mixed question of law and fact. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384–385 [112 Cal.Rptr.3d 853, 235 P.3d 152] (*Haworth*).) Our review is de novo. (*Ibid.*)

## DISCUSSION

### I.

### *The Enforceability of the Fee Agreement*

#### A.

#### *The Provision of the Agreement Requiring Submission of the Fee Dispute to Binding Arbitration Pursuant to BASF Rules Is Legally Impermissible Under Those Rules and the MFAA*

This case vividly illustrates the confounding problems that can be created by the failure of counsel to appreciate the significant distinction between the CAA and the MFAA with respect to predispute agreements to arbitrate.[6]

■ " 'The CAA "represents a comprehensive statutory scheme regulating private arbitration in this state. (§ 1280 et seq.)" ' " (*Schatz, supra,* 45 Cal.4th at p. 564, quoting *Aguilar v. Lerner* (2004) 32 Cal.4th 974, 983 [12 Cal.Rptr.3d 287, 88 P.3d 24] (*Aguilar*).) Virtually any civil dispute can be the subject of CAA arbitration. (*Schatz,* at p. 565; *Aguilar,* at p. 984). " '[T]he MFAA constitutes a separate and distinct arbitration scheme' " under which local bar associations conduct arbitrations specifically and solely dealing with attorney-client disputes over legal fees and costs. (*Schatz,* at pp. 564–565, quoting *Aguilar,* at p. 983.)[7] Whereas arbitration under the CAA is based on

---

[6] Certification of this opinion for publication is in our view warranted because it applies an existing rule of law to a set of facts significantly different from those stated in published opinions, explains existing rules of law, clarifies the application and interplay of related statutory schemes, and involves a legal issue of continuing public interest. (See Cal. Rules of Court, rule 8.1105(c)(2), (3), (4), (6).) In addition, we hope it will provide the legal community a useful cautionary tale.

[7] " 'The MFAA was first proposed by the Board of Governors of the State Bar of California in 1976 when, finding that disputes concerning legal fees were the most serious problem between members of the bar and the public, the board sought to create a mechanism for arbitrating disputes over legal fees and costs. Recognizing the "disparity in bargaining power

the parties' agreement to arbitrate, arbitration under the MFAA is based on a statutory directive; arbitration under the MFAA is voluntary for a client and mandatory for an attorney if initiated by a client. (*Schatz, supra,* 45 Cal.4th at p. 565, citation omitted; see *Aguilar, supra,* 32 Cal.4th at p. 984; Bus. & Prof. Code, § 6200, subd. (c).) Arbitration under the CAA is binding and " 'parties choosing to resolve their dispute in standard arbitration pursuant to the CAA "typically expect" that the arbitrator's decision will be final, [but] an award rendered pursuant to an arbitration under the MFAA is nonbinding, and either party may seek a trial de novo (§ 6204, subd. (a))' " unless the parties agree *after a dispute has arisen* that the arbitration will be binding. (*Schatz,* at p. 565; *Aguilar,* at p. 985, Bus. & Prof. Code, § 6204, subd. (a).) A contractual right to binding arbitration survives if arbitration under the MFAA is waived or fails to resolve the dispute. (*Schatz,* at pp. 562, 574–575; *Ervin, Cohen & Jessup, LLP v. Kassel* (2007) 147 Cal.App.4th 821, 828–829 [54 Cal.Rptr.3d 685].)

As initially briefed, the main issue presented by the parties on this appeal, as in the trial court, was whether the arbitration award should be confirmed or vacated in light of Kors's claim that the chief arbitrator failed to make disclosures required under section 1281.9. As we have said, BWM responded to Kors's claims of inadequate disclosure by arguing that section 1281.9 does not require the disclosure she claimed necessary. In response to our rehearing order and request for supplemental briefing, however, BWM now contends that the arbitration in this case "was not under the CAA," but rather under the MFAA. Section 1281.9 is altogether inapplicable, BWM now argues, because Kors's petition to compel arbitration sought enforcement of an arbitration clause calling for arbitration under BASF Rules (which implement the MFAA), and section 1281.9 is not among the CAA provisions incorporated into those rules.

It is far too late for BWM to advance such an argument. " 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to

in attorney fee matters which favors the attorney in dealings with infrequent consumers of legal services" (Hargarten & Ardisson, *Fine Tuning California's Mandatory Attorney Fee Arbitration Statute* (1982) 16 U.S.F. L.Rev. 411, 415), that many clients could not afford hiring additional counsel to litigate fee disputes in the civil courts (*ibid.*), and that previous schemes that called for voluntary arbitration were ineffective (*id.* at pp. 413–414), the Legislature enacted the MFAA. The original legislation provided in pertinent part: "The Board of Governors [of the State Bar of California] shall, by rule, establish, maintain, and administer a system and procedure for the arbitration of disputes concerning fees charged for professional services by members of the State Bar or by members of the Bar of other jurisdictions." (Stats. 1978, ch. 719, § 1, p. 2249.) This mandate has been expanded to include mediation, but is otherwise unchanged today. (§ 6200, subd. (a).)' " (*Schatz, supra,* 45 Cal.4th at pp. 564–565, quoting *Aguilar, supra,* 32 Cal.4th at p. 983.)

the trial court, but manifestly unjust to the opposing litigant.' " (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1350, fn. 12 [82 Cal.Rptr.3d 229, 190 P.3d 586] [party could not argue on appeal that issue was governed by Federal Arbitration Act after litigating in trial court on theory that CAA controlled], quoting *Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [22 P.2d 715].) Both parties litigated the disclosure issue at trial and on appeal (prior to rehearing) on the assumption the arbitration was subject to section 1281.9 and the trial court ordered "binding contractual arbitration *under the CAA*." (Italics added.) Furthermore, by its own terms, the agreement authorizes submission of the fee dispute to the BASF for binding arbitration *only* "to the extent permitted by law." This brings us to the nub of the matter: The provision of the fee agreement requiring binding arbitration under BASF Rules is "void and unenforceable" under those rules.

■ The MFAA provides that "[t]he parties may agree in writing to be bound by the award of arbitrators appointed pursuant to this article at any time *after the dispute over fees, costs, or both, has arisen*." (Bus. & Prof. Code, § 6204, subd. (a), italics added.) Consistent with this provision, the BASF Rules state that an arbitration clause in a fee agreement is "valid" and "consistent with California law" if it "contains a provision providing for Arbitration concerning Attorney's fees and costs *and does not require that such Arbitration be binding*" and "[u]nder such provision, the Client may be compelled to participate in Arbitration under [the BASF] [p]rogram . . . ." (BASF Rules, rule 4.A.1, italics added.) An arbitration clause in a fee agreement is "invalid" under the BASF Rules, however, if it requires a client "to submit to Binding Arbitration to resolve a fee dispute before the dispute arises. Any provision in an Attorney Fee Agreement purporting to require the Client to submit to Binding Arbitration is considered void and unenforceable." (BASF Rules, rule 4.A.2.) In short, the provision of the arbitration clause requiring the parties to submit any fee dispute for binding arbitration under BASF Rules is invalid under those very rules, as well as under the MFAA.

As noted, the fee agreement provided that any fee dispute between the parties shall be submitted to binding arbitration pursuant to the rules of the BASF only *"to the extent permitted by law."* (Italics added.) The provision of the September 28, 2007 order directing "binding contractual arbitration under BASF's Rules of Procedure for the arbitration of attorney/client fee disputes" was erroneous because such arbitration was not "permitted by law."

Binding arbitration pursuant to BASF Rules would have required a postdispute agreement by Kors that never occurred. (BASF Rules, rule 5.A.) The BASF Rules provide that after a dispute has arisen a client may "voluntarily

request or consent to Arbitration and may choose either Binding or Non-Binding Arbitration." (BASF Rules, rule 4.A.2.) Where a predispute fee agreement requires binding arbitration, a client "is under no obligation to submit to Arbitration under [the BASF] Program." (BASF Rules, rule 4.A.2.) Arbitration can be compelled only if the client has previously agreed in writing to *nonbinding* arbitration or if, after the attorney requests arbitration, the client "timely executes a Reply Form consenting to Arbitration." (BASF Rules, rule 4.B.) Kors never agreed in writing to nonbinding arbitration under BASF Rules, nor did she agree to binding arbitration under those rules after the dispute arose. Contrary to BWM's argument, Kors's motion to compel binding arbitration did not constitute the sort of postdispute written agreement consenting to the jurisdiction of the BASF arbitration program that permits binding arbitration under BASF Rules. Kors's pleadings sought "an order enforcing the parties' agreement for binding arbitration of all disputes involved in this lawsuit and staying this action pending completion of any such arbitration, subject to dismissal if [BWM] does not initiate binding arbitration within a reasonable time." Kors expressly relied upon the CAA, sections 1281 and 1281.2, as authority for compelling arbitration and emphasized the language in the fee agreement requiring "binding arbitration" without discussing the agreement's reference to BASF Rules. Her motion to compel, and the pleadings she filed in support of that motion, did not ask the court to submit the dispute to the BASF for arbitration under its rules. Kors therefore cannot be viewed as having consented to binding arbitration under BASF Rules, rule 4.B, or as having invited the court's error in ordering such arbitration.

■ The trial court properly determined that Kors's effort to commence nonbinding arbitration pursuant to the MFAA and rules of the CCCBA did not waive her right to binding arbitration under the CAA. The court reasoned that Kors's conduct "resulted only in waiver of [her] right to non-binding arbitration under the [MFAA]" and she "retained her right to enforce the parties' agreement for binding contractual arbitration under the CAA." This conclusion was correct. As our Supreme Court has explained, "[t]he two statutory schemes do not even govern the same subject. The MFAA concerns nonbinding arbitration that the parties did not agree to in advance, while the CAA concerns binding arbitration agreed to in advance. Furthermore, the two statutes may be rationally harmonized. As Justice Chin explained in his concurring opinion in *Aguilar*, 'Nothing in the MFAA makes [a binding] arbitration agreement . . . unenforceable. The MFAA and the CAA create two very different types of arbitration. . . . Both may be given effect. Clients may, if they wish, request and obtain nonbinding arbitration under the MFAA. That arbitration may, and often will, resolve the dispute. But if the client does not request nonbinding arbitration, or if it is held but does not resolve the dispute, then the MFAA has played its role, and the matter would continue without it.

Either party may then pursue judicial action unless the parties had agreed to binding arbitration. In that event, the CAA would apply, and the dispute would go to binding arbitration. This conclusion is consistent with the statutory language of both the MFAA and the CAA and the strong public policy in favor of binding arbitration as a means of resolving disputes.' (*Aguilar, supra*, 32 Cal.4th at p. 991 (conc. opn. of Chin, J.), fn. omitted.)" (*Schatz, supra*, 45 Cal.4th at p. 574.) Here, Kors requested nonbinding arbitration under the MFAA in Contra Costa County and her request was denied. It follows from *Schatz* that this did not extinguish her rights under the CAA.

██ Given the unenforceability of the contractual provision for binding arbitration under MFAA rules, however, the court's finding "that BASF has jurisdiction to conduct the arbitration, and the Court is unaware of any reason why BASF would decline to exercise that jurisdiction," is somewhat puzzling, as is BASF's exercise of jurisdiction. BWM urges that Kors waived any challenge to arbitration under BASF Rules by participating in the arbitration. "[I]f a party believes the entire contractual agreement or a provision for arbitration is illegal, it must oppose arbitration on this basis before participating in the process or forfeit the claim. (*Moncharsh* [*v. Heily & Blase* (1992)] 3 Cal.4th [1,] 31 [10 Cal.Rptr.2d 183, 832 P.2d 899].) *Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1372–1373 [131 Cal.Rptr.2d 524], applied this rule to a claim of an unconscionable 'statute of limitations' in the arbitration procedure that a party invoked; 'A contrary rule might tempt a party to "play games" with the arbitration and not raise the issue of illegality until and unless it lost.' " (*Cummings v. Future Nissan* (2005) 128 Cal.App.4th 321, 328 [27 Cal.Rptr.3d 10].)

To be sure, Kors did not point out to the trial court the unenforceability of the arbitration provision under the MFAA or the inconsistency in ordering CAA arbitration pursuant to BASF Rules. However, as we have said, neither did BWM nor BASF. Kors, at least, has been consistent in her position that the CAA governed this arbitration. She sought to compel arbitration under the authority of the CAA and participated in the arbitration after the court granted her motion; nothing in her participation reflects a waiver of rights under the CAA, including the right to disclosure required by section 1281.9.

In essence, since both parties contributed in some measure to the trial court's error in ordering binding arbitration under MFAA/BASF Rules, we are called upon to determine which party must bear the greater cost of failing to make clear to the trial court the unenforceability of the arbitration clause under the act and rules. According to the representations of counsel at oral argument, neither party was aware of this problem until we ordered rehearing on our own motion. However, because it drafted the agreement, BWM

created the problem. Additionally, requiring BWM to bear the greater responsibility—by severing the unlawful provision of the arbitration clause submitting the fee dispute to arbitration under BASF Rules and enforcing the remainder of the clause lawfully requiring binding arbitration (see discussion, *post*, at p. 60)—simply restores the parties to their prearbitration positions. If they rearbitrate the merits of their dispute, the ultimate result might again favor BWM, or it might favor Kors. Finding a waiver by Kors, by contrast, would leave the arbitration award standing despite possible unfairness in the arbitration proceeding. In making this observation, we do not mean to suggest SeLegue was in fact biased in any way, only that due to the erroneous arbitration order, he was not subjected to the CAA disclosure requirements.

BWM insists that an arbitration provision "virtually identical" to the one here was enforced in *Aguilar, supra*, 32 Cal.4th 974. The provision in *Aguilar* stated that any disagreement between the client and attorney concerning fees or other claims arising out of the representation would be submitted "to binding arbitration under the rules of the San Francisco Bar Association and the Code of Civil Procedure of the State of California." (*Id.* at p. 980.) *Aguilar* held that this agreement to binding arbitration was enforceable *under the CAA* after the client waived his rights under the MFAA. (32 Cal.4th at pp. 989–990.) Although one of the client's arguments was that he did not waive the protections of the MFAA because the arbitration agreement was entered before the dispute arose, the *Aguilar* majority expressly found this point irrelevant since the waiver of the MFAA resulted from the client's filing of a malpractice action against the attorney (Bus. & Prof. Code, § 6201, subd. (d)), not from the arbitration agreement. (32 Cal.4th at p. 988.) The agreement in that case predated the amendment of the MFAA requiring that an agreement for binding MFAA arbitration be made after the dispute has arisen. (32 Cal.4th at p. 990, fn. 8; *id.* at pp. 993–994 (conc. opn. of Moreno, J.).) Prior to the 1996 amendment, Business and Professions Code section 6204, subdivision (a), simply stated that the parties "may agree in writing to be bound by the award" of the arbitrators; the amendment added the language critical here, "at any time after the dispute over fees, costs, or both, has arisen." (*Aguilar, supra*, 32 Cal.4th at p. 988, italics omitted; Stats. 1996, ch. 1104, § 16, p. 7914.) Because its finding of waiver was not based on the language of the arbitration agreement, *Aguilar* stated, "whether [the client] entered his arbitration agreement pre- or post-dispute is irrelevant, as is which version of the statute applies to the agreement." (*Aguilar*, at p. 988.) *Aguilar* did not consider the question presented here, whether predispute agreements for binding arbitration *under the MFAA* entered after the amendment to

Business and Professions Code section 6204, subdivision (a), are enforceable under the *MFAA*, much less hold that such agreements are enforceable.[8]

BWM quotes Justice Chin's concurring opinion in *Aguilar*—"[T]he parties may agree to some form of dispute resolution other than judicial action . . ." (*Aguilar, supra*, 32 Cal.4th at p. 992 (conc. opn. of Chin, J.))—and urges that Justice Chin rejected the analysis of *Alternative Systems, Inc. v. Carey* (1998) 67 Cal.App.4th 1034, 1042 [79 Cal.Rptr.2d 567], that "would have found a pre-dispute agreement for binding arbitration to be invalid." The question Justice Chin was addressing in the quoted passage was whether the MFAA's provision for another proceeding following a nonbinding arbitration necessarily required a court trial or could be satisfied by a binding CAA arbitration if the parties so agreed. His disagreement with *Alternative Systems* was with its statement "that the references in section 6204 to a 'trial' and 'an action in . . . court' mean that after nonbinding arbitration, the dispute can only be resolved in *court*, and may not be resolved by binding arbitration even if the parties had agreed to such binding arbitration." (*Aguilar*, at p. 992.) The court in *Alternative Systems* found the provision for binding arbitration invalid because it viewed enforcing the arbitration provision as denying the client the de novo trial to which he was entitled under the MFAA. Justice Chin and *Alternative Systems* did not reach their conclusions on the basis of whether the binding arbitration provision was entered predispute or postdispute; in both cases, the fee agreement was entered before the amendment of Business and Professions Code section 6204, subdivision (a), adding the language that makes this distinction critical.

█ BWM also views *Schatz, supra*, 45 Cal.4th 557, as finding a predispute provision requiring binding arbitration enforceable. And so it did—but under the CAA, not under the MFAA. The agreement in *Schatz* provided that " 'in the event of any dispute arising out of or relating to this agreement, our relationship, or the services performed (including but not limited to disputes regarding attorneys' fees or costs . . .), such dispute shall be resolved by submission to binding arbitration in San Diego County, California, before a retired judge or justice.' " (*Schatz*, at p. 563.) Accepting Justice Chin's reasoning in his *Aguilar* concurrence, and rejecting that of *Alternative*

---

[8] BWM characterizes *Aguilar* as having established that parties "may choose a local bar association to hear the dispute under its rules." The agreement in *Aguilar* did specify "binding arbitration under the rules of the San Francisco Bar Association and the Code of Civil Procedure of the State of California." (*Aguilar, supra*, 32 Cal.4th at p. 980.) As we have said, the arbitration conducted in *Aguilar* was CAA arbitration, as expressly stated in the opinion; it could not have been held under the BASF Rules for MFAA arbitrations used in the present case because the arbitration in *Aguilar* involved not just fee claims but also legal malpractice claims, which are outside the scope of BASF's MFAA program. (See BASF Rules, rule 3.C.4.) The *Aguilar* opinion does not specify where the arbitration took place or which rules governed it.

*Systems, Schatz* concluded that if MFAA arbitration is not requested or fails to resolve the parties' dispute, a preexisting agreement for binding arbitration is enforceable. (*Schatz,* at p. 574.) As the court made clear, however, it is enforceable under the CAA, not the MFAA. "Thus, the focus of section 6204, subdivision (a) is how the parties may confer *binding* effect upon an *MFAA* arbitration, and may thus forestall any and all post-MFAA proceedings that one or the other of the parties might otherwise invoke. The subdivision does not purport to speak to whether the parties to a *nonbinding* MFAA arbitration may otherwise agree, or have agreed, on how to resolve the case if the MFAA arbitration leaves one or both parties dissatisfied. The subdivision does not foreclose the possibility that, under a general agreement between the parties, the *nonbinding* MFAA process should be followed by *binding* arbitration, rather than by a lawsuit." (45 Cal.4th at p. 572.)

BWM's suggestion that *Aguilar* and *Schatz* demonstrate that "pre-dispute binding arbitration provisions in fee agreements are permissible" is misleading. Such provisions are enforceable, as we have discussed, under the CAA. But they are plainly *not* enforceable under the MFAA. BWM cannot have it both ways. The predispute provision for binding arbitration was enforceable, but not in an MFAA arbitration under BASF Rules implementing the MFAA.

██ " 'Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest.' (Civ. Code, § 1599.)" (*MKB Management, Inc. v. Melikian* (2010) 184 Cal.App.4th 796, 803 [108 Cal.Rptr.3d 899].) The provision of the predispute agreement requiring binding arbitration of any future fee dispute, which is lawful, has an object distinct from that of the provision submitting such a dispute to the arbitration process prescribed by the rules of the BASF, which, as we have explained, is unlawful. The reasons for severing or restricting illegal terms rather than voiding the entire agreement are " 'to prevent parties from gaining undeserved benefit or suffering undeserved detriment' " and " 'to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] . . . [Citation.]' [Citation.]" (*Id.* at pp. 803–804.)

Since the effect of the provision of the arbitration clause submitting the fee dispute to arbitration under BASF Rules was unintended and indeed *unknown* to the parties, severing it from the agreement would not impose on either of them any undeserved benefit or detriment. Enforcement of the remainder of the clause, which requires binding arbitration of the parties' fee dispute, achieves the paramount purpose of their contractual relationship without condoning any "illegal scheme."

The remaining question, to which we now turn, is whether the denial of Kors's right to the disclosure required of an arbitrator under the CAA

requires us to reverse the order confirming the arbitration award. Reversal would be necessary only if application to SeLegue of section 1281.9 would have required him to provide the disclosure Kors claims; otherwise she would not have been prejudiced.

## B.

### Arbitration Under the BASF Rules Prejudicially Deprived Kors of Protections She Was Entitled to Under the CAA, and the Order Confirming the Award Must Therefore Be Reversed

■ The most astonishing aspect of this case is that everyone involved—the trial judge, Kors, BWM, the BASF, and the arbitrators—appears to have been oblivious to the fact that the arbitration SeLegue conducted was not permitted by the MFAA or the rules of the BASF. As an arbitrator selected by BASF to participate in its MFAA arbitration program, SeLegue apparently had no reason to believe he was subject to the CAA disclosure requirement. BASF Rules specifically incorporate certain provisions of the CAA,[9] but section 1281.9 is not one of them. (BASF Rules, rule 2.B.)[10] By submitting

---

[9] Section 2.B of the BASF Rules, entitled "Laws and Regulations," provides: "The California Arbitration Act, Code of Civil Procedure Sections 1282–84.2 shall apply to matters not dealt with in these Rules or in Business and Professions Code Sections 6200–06. In the event of a conflict between these Rules and the Code of Civil Procedure, these Rules shall govern."

[10] In addition to the BASF Rules not including section 1281.9 among the CAA provisions potentially applicable to MFAA arbitrations, there are other reasons to conclude section 1281.9 does not apply in the MFAA context. Standard 7(d)(14)(A) of the Ethics Standards for Neutral Arbitrators in Contractual Arbitration (Standards), which is incorporated into the California Rules of Court (§ 1281.85) and, like section 1281.9, requires disclosure of any matter that "[m]ight cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial," does not apply to MFAA arbitrators because Standard 3(b)(2)(C) makes the Standards inapplicable to MFAA arbitration. The MFAA directs the State Bar to "provide by rule for an appropriate procedure to disqualify an arbitrator or mediator upon request of either party" (Bus. & Prof. Code, § 6204.5, subd. (a)), as the BASF did in its rule 7.F. Several factors at least arguably support a conclusion that the disclosure requirements for MFAA arbitrators should not be as stringent as those applicable to CAA arbitrators, notable among them that arbitrators serving under the MFAA are not compensated, at least for the first full day of arbitration (BASF Rules, rule 13.E) and are appointed by the bar association (BASF Rules, rule 7) rather than being selected by the parties (§ 1281.6).

On the other hand, an "Arbitration Advisory" promulgated by the California State Bar Committee on Mandatory Fee Arbitration expresses the view that something like the disclosure requirements of section 1281.9 should apply in MFAA arbitrations. Advisory 97-01 begins by stating, "Avoiding not only bias, but also the appearance of bias, is of vital importance to the success of an arbitration," and recommends "full disclosure of all knowledge and relationships to parties and their counsel." (Advisory 97-01, p. 1.) The Advisory relies heavily on then existing section 1282, subdivision (e), which required disqualification of an arbitrator, on

the case to the BASF for arbitration under its rules, which are prescribed by the MFAA, the trial court effectively relieved SeLegue of the duty to comply with section 1281.9. However, as we have said, it is necessary to determine whether the CAA would require the disclosure Kors claims, because it is only in that event that reversal would be required.

Section 1281.9, subdivision (a), imposes on arbitrators a duty to "disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial, *including* all of the following: [¶] (1) The existence of any ground specified in Section 170.1 for disqualification of a judge. . . . [¶] (2) Any matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council pursuant to this chapter. [¶] (3) The names of the parties to all prior or pending noncollective bargaining cases in which the proposed neutral arbitrator served or is serving as a party arbitrator for any party to the arbitration proceeding or for a lawyer for a party and the results of each case arbitrated to conclusion . . . . [¶] (4) The names of the parties to all prior or pending noncollective bargaining cases involving any party to the arbitration or lawyer for a party for which the proposed neutral arbitrator served or is serving as neutral arbitrator, and the results of each case arbitrated to conclusion . . . . [¶] (5) Any attorney-client relationship the proposed neutral arbitrator has or had with any party or lawyer for a party to the arbitration proceeding. [¶] (6) Any professional or significant personal relationship the proposed neutral arbitrator or his or her spouse or minor child living in the household has or has had with any party to the arbitration proceeding or lawyer for a party." (Italics added.)

In the trial court and the briefs originally filed in this court, the parties' dispute was whether this requirement may include business relationships with persons or entities that are not parties or lawyers for parties in the subject arbitration. BWM posited two reasons SeLegue had no duty under section

demand of a party, based on any of the grounds for disqualification of a judge under section 170.1. Section 170.1 includes the ground that "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (§ 170.1, subd. (a)(6)(A)(iii).) The Advisory explains, "To allow the parties to evaluate whether or not the capacity to be impartial exists, it is necessary for the arbitrator to disclose to all parties any circumstances where one could reasonably form a belief that an arbitrator would be biased for or against a party. The standard is whether a reasonable person, knowing all the facts and looking at the circumstances at the time the motion is brought, would question the arbitrator's impartiality [(*Betz v. Pankow* (1995) 31 Cal.App.4th 1503, 1508–1509 [38 Cal.Rptr.2d 107])]. There is no bright line of demarcation for the existence of an impression of possible bias, and each case must be considered in light of its particular circumstances. An arbitrator's award will be vacated if a reviewing Court determines that the rights of a party were substantially prejudiced by the misconduct or bias of a neutral arbitrator [(*Betz v. Pankow, supra,* 31 Cal.App.4th at p. 1508; Code Civ. Proc., § 1286.2, subds. (b), (c))]." (Advisory 97-01, pp. 2–3, italics added & underscoring omitted.)

1281.9 to disclose the matters identified by Kors: *first*, because those matters do not relate to any of the situations, relationships or other factors enumerated in subdivision (a), subparagraphs (1) through (6), of section 1281.9, and, *second*, because the premise of Kors's disclosure claim, "that an attorney arbitrator who represents large law firms [in] fee disputes is inherently biased in favor of law firms [engaged in such disputes]," is unreasonable. BWM argues that in relying on the general requirement of disclosure of matters that could raise a reasonable doubt as to impartiality, Kors is attempting to impose a duty of disclosure that was "plainly rejected" by the Legislature.

The trial court appears to have agreed with BWM that section 1286.2 provides grounds for vacating an arbitration award for failure to disclose only where the undisclosed matter consists of the relationships with a party or lawyer or other matters specifically described in subparagraphs (1) through (6) of subdivision (a) of section 1281.9.[11] The correctness of this interpretation of the statutes presents a purely legal issue.

BWM assumes, as presumably did the trial court, that the existence of one or more of the grounds, matters, circumstances or relationships specifically enumerated in subdivision (a)(1) through (6) of section 1281.9 provide the *exclusive* bases upon which the statutory duty to disclose may be predicated. BWM urges that those provisions of section 1281.9 do not "impose any duty to make *disclosures of the subject matter of an arbitrator's prior legal practice.*" According to BWM, "had the Legislature wished to impose a broad obligation on arbitrators to disclose their activities as counsel, the Legislature would have done so. Instead, the Legislature drew a very clear line in subdivisions (a)(3), (4), and (5). Disclosures are required if the arbitrator has

---

[11] The trial court stated: "The gravamen of [Code of Civil Procedure section] 1286.2(a)(6) is a relationship with a party, attorneys, [or a] set of facts or specific issues in the case, and there is no such showing here. [Code of Civil Procedure section] 1286.2(a)(1)–(5) require misconduct that is not demonstrated in this case."

Section 1286.2, subdivision (a)(6), sets forth the requirement that an arbitration award be vacated if the arbitrator fails to disclose a ground for disqualification of which he or she was aware. This statute does not itself elaborate the substance of any disclosure requirements. The court's reference to "relationship with a party, attorneys, [or a] set of facts or specific issues in the case" appears to address the provisions of section 1281.9, subdivision (a)(1) through (6), which enumerate certain required disclosures concerning the matters the court mentioned.

Subdivisions (a)(1) through (5) of section 1286.2 set forth other grounds for vacation of an arbitration award: "(1) The award was procured by corruption, fraud or other undue means. [¶] (2) There was corruption in any of the arbitrators. [¶] (3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator. [¶] (4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted. [¶] (5) The rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions of this title."

previously represented any of the parties or if he or she has served as an arbitrator in a matter involving the parties or their attorneys. Otherwise, disclosure is not required."

██ BWM's interpretation of section 1281.9 is certainly not justified by its text, which does no more than *include* the enumerated factors as "matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial." If the enumerated grounds were exclusive, the duty to disclose would be far more limited than the Legislature obviously intended by requiring disclosure of "*all matters*" that might cause an informed reasonable person to doubt the arbitrator's ability to be impartial.

Moreover, as courts have noted, subdivision (a)(2) of section 1281.9 specifically requires disclosure of "[a]ny matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council pursuant to this chapter."[12] (See *Azteca Construction, Inc. v. ADR Consulting, Inc.* (2004) 121 Cal.App.4th 1156, 1162, 1169 [18 Cal.Rptr.3d 142].) Standard 7(d)(14)(A) requires disclosure of "[a]ny other matter that: [¶] . . . Might cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial." This Standard "requires a person who is appointed as an arbitrator to disclose *any* matter *even if it is not specifically enumerated in the standard, if it* '[m]ight *cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial.*' " (*Advantage Medical Services, LLC v. Hoffman* (2008) 160 Cal.App.4th 806, 817 [72 Cal.Rptr.3d 935], italics added (*AMS*).)[13] Our Supreme Court recently confirmed that the general requirement to disclose "any matter that reasonably could create the appearance of partiality" is in addition to the specific disclosure requirements set forth in section 1281.9, subdivision (a)(1) through (6). (*Haworth, supra*, 50 Cal.4th at p. 381.)

---

[12] The Standards were adopted by the Judicial Council pursuant to section 1281.85, which provides that the Standards "shall be consistent with the standards established for arbitrators in the judicial arbitration program and may expand but may not limit the disclosure and disqualification requirements established by this chapter. The standards shall address the disclosure of interests, relationships, or affiliations that may constitute conflicts of interest, including prior service as an arbitrator or other dispute resolution neutral entity, disqualifications, acceptance of gifts, and establishment of future professional relationships." (§ 1281.85, subd. (a).)

[13] The comment to Standard 7 explains: "While the remaining subparagraphs of (d) require the disclosure of specific interests, relationships, or affiliations, these are only examples of common matters that could cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial. The absence of the particular interests, relationships, or affiliations listed in the subparagraphs does not necessarily mean that there is no matter that could reasonably raise a question about the arbitrator's ability to be impartial and that therefore must be disclosed." (Cal. Rules of Court, com. to Std. 7.)

The trial court thus erred in concluding that the only matters required to be disclosed under section 1281.9, subdivision (a), are those expressly enumerated in subparagraphs (1) through (6) of that subdivision.

BWM's alternative argument is that Kors cannot prevail because a person aware that SeLegue's legal practice focused upon the representation of law firms in fee disputes and other litigation with former clients would not reasonably doubt his ability to be impartial in the present fee dispute. BWM points out that the requirement to disclose " 'matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial' sets the same standard as that set for a sitting judge's mandatory disqualification under section 170.1,"[14] and that judges are not bound to disclose matters analogous to those Kors claims SeLegue was required to disclose.

BWM finds support for this argument in the Supreme Court's recent statement that it found "no reason to interpret the appearance-of-partiality rule more broadly in the context of arbitrator disclosure than in the context of judicial recusal." (*Haworth, supra*, 50 Cal.4th at p. 393.) However, the disclosure Kors seeks is not broader than would be required of a judge; it simply relates to matters that are not relevant to judges. Judges cannot engage in private business relationships comparable to those of the arbitrator in this case and many others; nor do judges suffer or enjoy any personal economic consequences as a result of their decisions. Because it relates to economic interests judges do not possess, the subject of the disclosure Kors seeks from SeLegue has no application to judges. *Haworth* and the other cases BWM relies upon do not involve the sort of circumstances that underlie Kors's disclosure claim.

*Haworth* involved arbitration of a female patient's claim that her physician was negligent in performing cosmetic surgery on her lip. The superior court vacated an award in favor of the physician on the ground that the arbitrator failed to make a disclosure required under section 1281.9, subdivision (a). The Supreme Court disagreed, holding that the arbitrator, a former judge, was not required to disclose that, "10 years earlier, he received a public censure based upon his conduct toward and statements to court employees, which together created 'an overall courtroom environment where discussion of sex and improper ethnic and racial comments were customary.' " (*Haworth, supra*, 50 Cal.4th at p. 377.) The *Haworth* court rejected the argument that the censure would cause a person to reasonably conclude the arbitrator might be

---

[14] Section 170.1, subdivision (a)(6)(A)(iii), provides that a judge "shall be disqualified" where "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial," which requires the same breadth of disclosure prescribed by section 1281.9.

biased against a female plaintiff in a medical malpractice case involving cosmetic surgery. (*Id.* at p. 389.) In particular, the court noted that the conduct for which the former judge had been censured occurred some 15 years before the subject arbitration and did not involve litigants or take place while court was in session, and that the fact the former judge was censured rather than removed from office reflected the Supreme Court's view that his conduct did not indicate he could not be fair to female litigants generally. (*Id.* at p. 390.) Since possible inferences to be drawn from the censured conduct could point either in favor of the female patient or in favor of the male physician, the public censure "simply provides no reasonable basis for a belief that [the former judge] would be inclined to favor one party over the other in the present proceedings." (*Id.* at p. 391.) As *Haworth* explained, " '[a]n impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased *for or against a party for a particular reason.*' (*Betz v. Pankow, supra,* 31 Cal.App.4th at p. 1511, italics added.)" (*Haworth,* at p. 389.) Highlighting the importance of a subject matter link between the current arbitration and the matter subject to disclosure, the court noted that "the subject matter of this arbitration was not such that the circumstance of gender was material, or that gender stereotyping was likely to enter into the decision made by the arbitrators" (*ibid.*) and that, "[h]ad the subject of the arbitration in the present case involved, for example, workplace sexual harassment, we might have come to a different conclusion concerning [the former judge's] obligation to disclose the public censure." (*Id.* at p. 392, fn. 14.)

The cases BWM offers as demonstrating that the disclosure sought here would not be required of a judge under section 170.1 similarly address the kind of subject matter linkage and immediacy required to warrant disqualification. *People v. Chatman* (2006) 38 Cal.4th 344 [42 Cal.Rptr.3d 621, 133 P.3d 534], held that " 'doubt regarding [the trial judge's] ability to remain impartial' " (*id.* at pp. 363–364), was not raised where the judge trying a defendant charged with stabbing a woman to death during a robbery of a photo shop disclosed that 15 years earlier his daughter had been the victim of a robbery at knifepoint in a photo shop. The judge's daughter had not been injured and he had not spoken to her about the incident in over 10 years. (*Id.* at pp. 360–361.) Nor was doubt as to the judge's impartiality raised by the judge's commiseration with the victim's father in the courtroom after the death verdict was rendered, which the *Chatman* court viewed as simply an expression of courtesy. (*Id.* at pp. 361–362.) In *United Farm Workers of America v. Superior Court* (1985) 170 Cal.App.3d 97 [216 Cal.Rptr. 4], disqualification was not required where the judge trying a grower's suit for damages arising out of union activity during a strike disclosed that his wife had worked as a replacement worker for the grower for two or three days during the strike. (*Id.* at pp. 100–101.) The court noted that the circumstances

at issue did not involve the judge directly, there was no continuing relationship between the judge's wife and the grower giving rise to a current personal or financial interest that would disqualify the judge, and the judge's wife was not involved in any of the events at issue in the current lawsuit. (*Id.* at pp. 105–106.) *Leland Stanford Junior University v. Superior Court* (1985) 173 Cal.App.3d 403, 405 [219 Cal.Rptr. 40], held disqualification should not have been granted in a suit against Stanford University challenging certain physical developments on the campus. The judge, 13 years earlier, had been president of the Stanford Law Society for seven years. (*Id.* at pp. 405–406.) The Court of Appeal held that "the 'average person on the street' " would find this "both so remote and so unrelated to the management of Stanford's land and physical facilities as to raise no doubt as to Judge Thompson's ability to be impartial in this matter." (*Id.* at p. 408.)

In the present case, the arbitrator was contemporaneously engaged in the private representation of lawyers and law firms on issues of professional responsibility and representing a law firm in a case involving an attorney fee dispute. Neither *Haworth* nor any of the other cases BWM relies upon involve anything like this simultaneous representation of clients in the same position as one of the parties to the current arbitration in matters involving the same subject matter. The disclosure Kors sought relates to substantial business relationships and economic interests not at issue in *Haworth* or BWM's other cases. Unlike those cases, the disclosure at issue here was of matters that clearly could create a reasonable belief that the arbitrator " 'was biased *for or against a party for a particular reason.*' (*Betz v. Pankow, supra,* 31 Cal.App.4th at p. 1511, italics added.)" (*Haworth, supra,* 50 Cal.4th at p. 389.)

The judicial process is not ordinarily administered by persons chosen by the parties and paid a fee for the service, but by public officials chosen by a process in which the public participates, whose compensation is at levels that are fixed by law and cannot be affected by their rulings. (See *Tumey v. Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437].) Their job is not to maximize the ends of private parties, nor simply to secure the peace, but to apply the law; and their decisions are almost invariably subject to review for faithfulness to the facts and the mandates of applicable statutes and constitutional principles.[15] Because judicial officers cannot accept a fee for their services, they have no economic interest in potential customers' responses to their decisions.

---

[15] We recognize that in this jurisdiction attorneys and retired judicial officers may serve as referees, sometimes chosen and paid by the parties (see, e.g., §§ 638, 639, 645.1, 1023; Cal. Rules of Court, rule 2.810 et seq.), but their determinations are normally subject to judicial review (see § 645). The same is true for the decisions of temporary judges (Cal. Const., art. VI, § 21; Cal. Rules of Court, rules 2.830, 2.831; *City of Shasta Lake v. County of Shasta* (1999) 75

Private arbitration, on the other hand, has become a major commercial enterprise in this jurisdiction. The importance of the duty to disclose to the integrity of this enterprise was discussed in *Mahnke v. Superior Court* (2009) 180 Cal.App.4th 565 [103 Cal.Rptr.3d 197]: "Courts have long struggled with the problem of ensuring not only the neutrality but also the perception of neutrality of arbitrators, who wield tremendous power to decide cases and whose actions lack, for the most part, substantive judicial review. As the United States Supreme Court observed in vacating an arbitration award under the Federal Arbitration Act, 'It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.' " (*Id.* at pp. 573–574, quoting *Commonwealth Corp. v. Casualty Co.* (1968) 393 U.S. 145, 148–149 [21 L.Ed.2d 301, 89 S.Ct. 337]; accord, *Haworth, supra,* 50 Cal.4th at p. 393; *La Serena Properties, LLC v. Weisbach* (2010) 186 Cal.App.4th 893 [112 Cal.Rptr.3d 597]; see also *Azteca Construction, Inc. v. ADR Consulting, Inc., supra,* 121 Cal.App.4th at p. 1165.)

The widespread use in this state of referees and arbitrators selected and paid by the parties in disputes removed from the judicial system has raised issues that have long been recognized and studied, including the danger that the arbitrator's impartiality might be compromised by economic considerations. At the time the present version of section 1281.9 was enacted, concern focused on the increasing use by private corporations and industry associations of standard agreements and contract clauses mandating the private arbitration of future disputes (see Judicial Council of Cal., *Alternative Dispute Resolution in Civil Cases: Report of the Task Force on the Quality of Justice, Subcommittee on Alternative Dispute Resolution and the Judicial System* (Aug. 1999) at p. 33), including mandatory arbitration clauses in attorney retainer agreements (*Aguilar, supra,* 32 Cal.4th at p. 985).

This development conferred on arbitrators "such mighty and largely unchecked power" that the Legislature undertook "an increasingly more active role in protecting the fairness of the process." (*Azteca Construction, Inc. v. ADR Consulting, Inc., supra,* 121 Cal.App.4th at p. 1165.) According to an Assembly committee analysis of the measure that enacted present section 1281.9, the growing use of private arbitrators in California " 'has given rise to a largely unregulated private justice industry. While lawyers who act as arbitrators under the judicial arbitration program are required to comply with

Cal.App.4th 1, 11 [88 Cal.Rptr.2d 863]) and private judges (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2010) ¶ 6:5, p. 6-1 (rev. # 1, 2010), ¶ 6:115, p. 6-30 (rev. # 1, 2009)).

the Judicial Code of Ethics, arbitrators who act under private contractual arrangements are, surprising to many, currently not required to do so. . . . Because these obligations do not attach to private arbitrators, parties in private arbitrations are not assured of the same ethical standards as they are entitled to in the judicial system.' (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.) as amended Aug. 20, 2001, p. 4 . . . .)" (*Azteca Construction, Inc. v. ADR Consulting, Inc.*, at p. 1165, fn. 7.)

One of the ethical problems the Legislature was specifically concerned about was the danger that, like the referees in proceedings authorized by sections 638 and 639,[16] arbitrators' impartiality might be undermined by their economic self-interest. As one commentator pointed out, "[p]ayments to free market referees raise particular concerns insofar as referees may be influenced to decide cases in favor of the party more likely to bring cases to them in the future. To a certain extent, this problem would be solved by the consent requirement, since no one would consent to a reference if he knew the referee would favor his opponent. As a safeguard, however, consent would be effective in protecting the integrity of reference proceedings if all parties had perfect knowledge about all referee decisions. Those parties with the greatest experience with reference, however, would have superior knowledge. Similar parties in other contexts have been called 'repeat players,' but under the market conditions that prevail in reference, they might better be termed steady customers. Steady customers represent an important asset to any seller and a referee would find it in his self interest to favor these parties where possible. Of course, any favoritism could not be overt, for then the opponents of the steady customers would refuse to consent. But over time, referees could safely give steady customers the benefit of the doubt more often than not. Steady customers would suspect that their status was giving them a small edge, and this would bring them back into reference for future fights. But their opponents, the one-time customers, would not be aware of the subtle systemic bias working against them. They could not therefore make a fully informed choice when they consented to the reference." (Note, *The California Rent-A-Judge Experiment: Constitutional and Policy Considerations of Pay-As-You-Go Courts* (1981) 94 Harv. L.Rev. 1592, 1608, fn. omitted.)

---

[16] Section 638 provides in relevant part that "[a] referee may be appointed upon the agreement of the parties filed with the clerk, or judge, or entered in the minutes, or upon the motion of a party to a written contract or lease that provides that any controversy arising therefrom shall be heard by a referee if the court finds a reference agreement exists between the parties . . . ." Section 639 provides, among other things, that on the motion of a party or on its own motion, the court may appoint a referee in certain cases even if the parties do not agree. The fees of referees authorized by sections 638 and 639 are ordinarily paid by the parties. (See § 645.1.)

The CAA sought to diminish the advantage steady customers have over one-time customers, and in that manner protect the integrity of private arbitration, by requiring a proposed arbitrator to disclose the prior or pending cases in which he or she served as an arbitrator and the results of the arbitration—"including the date of the arbitration award, identification of the prevailing party, the names of the parties' attorneys and the amount of monetary damages awarded, if any." (§ 1281.9, subd. (a)(3), (4).) As we have said, these financial considerations do not come into play in the judicial system, but they cannot be ignored in the arbitral arena.

*AMS, supra*, 160 Cal.App.4th 806, which upheld the vacation of an arbitrator's award due to failure to disclose business relationships that could cause a reasonable doubt as to the arbitrator's impartiality, is illustrative. In that case, the American Arbitration Association (AAA) designated William J. Tucker, from the law firm Kaye, Rose & Partners, LLP (Kaye Rose), as arbitrator in a binding arbitration proceeding between plaintiff Advantage Medical Services LLC (AMS), and two defendants. (*Id.* at pp. 810–811.) Tucker granted AMS's request to have a representative of its insurer present at the arbitration without requiring AMS to first provide identifying information requested by the defendants' attorney. The representative, Cynthia Mitchell, introduced herself at the arbitration as " ' "coverage counsel for Lloyd[']s of London." ' " Tucker never inquired into the identity of the Lloyd's syndicates Mitchell represented, and made no disclosures regarding any past or present ties he or Kaye Rose had with Mitchell's law firm or with Lloyd's. At the close of the arbitration, Tucker issued an interim award in favor of AMS. (*Id.* at pp. 811–812.)

A bankruptcy attorney who was then associated in as counsel for the defendants, learned that Tucker and Kaye Rose represented " ' "major marine insurers," ' " and that " 'Tucker himself is extremely involved in the maritime/insurance defense aspects of his law firm's practice by acting as "correspondent counsel" for P&I [protection and indemnity] Clubs that serve as the vehicle for providing insurance and other services to various types of shipowners.' The P&I Clubs are directly tied to Lloyd's through maritime syndicates that provide the bulk of the insurance and reinsurance for shipowners around the world." (*AMS, supra*, 160 Cal.App.4th at p. 812.) Tucker refused to disqualify himself, stating that his law firm " 'has represented some maritime clients who may have been insured by one or more syndicates who occupy space within the Lloyd[']s of London Building, who underwrite maritime risks' " and " 'no syndicate at Lloyd[']s has ever been a client of [Kaye Rose] or of any firm with which I have ever been associated.' " (*Ibid.*)

The trial court granted the defendant's petition for an order disqualifying the arbitrator and vacating the award. (*AMS, supra*, 160 Cal.App.4th at

pp. 812–813, 815–816.) The Court of Appeal affirmed, pointing out that there was substantial evidence of Tucker's and Kaye Rose's involvement with Lloyd's, including that two syndicates of Lloyd's that were represented by Mitchell underwrote 75 percent of the AMS employment practices liability insurance policy; eight of the 13 P&I Clubs that comprise Lloyd's International Group had a relationship with Tucker and Kaye Rose; Kaye Rose advertises that it is the approved correspondent counsel for several P&I Clubs and Tucker is the contact person for matters in the San Diego area; participants in the maritime industry " 'are all very much aware of each other, of their respective ties to marine insurers and the predominant role Lloyds and its syndicates play with respect to loss prevention and indemnification' "; and " '[i]t would be incompatible for anyone approved as a "correspondent" for a P&I Club to take actions contrary to other participants; to do so would most certainly put at risk their status as approved "correspondent" counsel or otherwise.' " (*AMS*, at p. 819.) The *AMS* court found that the foregoing information " 'could cause a person aware of the facts to reasonably entertain a doubt that [Tucker] would be able to be impartial,' " and that Tucker failed to disclose it despite his duty to do so under section 1281.9. (160 Cal.App.4th at p. 819.)

BWM maintains *AMS* is distinguishable because it involved a professional relationship between the arbitrator and a party which was required to be disclosed under subdivision (a)(6) of section 1281.9,[17] and "Kors makes no showing of any business or professional relationship between the arbitrator and the parties, their counsel, the witnesses, or anyone involved or even remotely interested in the matter." BWM's distinction is in our view superficial.

It is true that the *AMS* court relied on subdivision (a)(6) of section 1281.9. But it also expressly relied upon Standard 7(d)(14)(A) of the California Rules of Court, which "requires a person who is appointed as an arbitrator to disclose any matter even if it is not specifically enumerated in the standard, if it '[m]ight cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial.' " (*AMS, supra*, 160 Cal.App.4th at p. 817.) *AMS* stressed the requirement imposed by section 1281.85, subdivision (a), and Standard 9(a), that an arbitrator "must make a reasonable effort to inform himself or herself of matters that must be disclosed under standards 7 and 8." (Cal. Rules of Court, Std. 9(a); see § 1281.85, subd. (a).) The rationale of *AMS* is most heavily predicated on the inference that a reasonable person aware of Tucker's and his law firm's business relationships with entities engaged in underwriting insurance and

---

[17] As material, subdivision (a)(6) of section 1281.9 requires disclosure of "[a]ny professional or significant personal relationship the proposed neutral arbitrator . . . has or has had with any party to the arbitration proceeding or lawyer for a party."

reinsurance, and the "incompatibility" of a person in that commercial network taking action contrary to the interests of other participants, would "reasonably entertain a doubt" about his ability to be impartial as an arbitrator in a dispute in which a representative of one party's insurer attended the arbitration. The crucial factors in *AMS* were that Tucker was " 'extremely involved in the maritime/insurance defense aspects of his law firm's practice' " and that even if, as Tucker asserted, neither he nor his law firm ever represented a syndicate of Lloyd's, "it was 'inconceivable that an attorney and firm with such a robust maritime practice could *not* have ties of some sort to Lloyds.' " (*AMS*, at p. 818.) Even if Tucker or his law firm never represented a Lloyd's syndicate, Tucker's business relationships nevertheless possessed the qualities that create an impression of possible bias; that is, they were "substantial" relationships that "involve financial consideration." (*Michael v. Aetna Life & Casualty Ins. Co.* (2001) 88 Cal.App.4th 925, 940 [106 Cal.Rptr.2d 240].)

The case before us presents analogous factors that could cause reasonable doubt about the ability of a person in SeLegue's shoes to be impartial. It is undisputed that SeLegue's legal practice focuses upon the professional responsibility of lawyers and law firms. As stated in his law firm's Web site, SeLegue's "business litigation background and extensive experience with the unique issues and dynamics involved in claims against lawyers allow him to provide effective representation of his clients, which include some of the nation's largest law firms. His experience in defending attorneys, and his deep knowledge of the law governing lawyers, allows him to provide practical solutions to lawyers who face ethical dilemmas." It is also undisputed that at the time he was appointed chief arbitrator, SeLegue was also representing a large law firm in a case before the California Supreme Court involving an attorney fee dispute (*Schatz, supra,* 45 Cal.4th 557), and that during the arbitration he was also representing another major law firm in an action for attorney malpractice and related torts.

SeLegue seems to us as "extremely involved" in the defense of lawyers and law firms as Tucker, the arbitrator in *AMS*, was in maritime defense. Just as it would be "incompatible" for a "correspondent" for entities engaged in underwriting insurance and reinsurance to take actions contrary to other participants in the insurance underwriting industry—because it " 'would most certainly put at risk their status as approved "correspondent" counsel or otherwise' " (*AMS, supra,* 160 Cal.App.4th at pp. 818–819)—so too could a reasonable person doubt whether SeLegue's dependence on business from lawyers and law firms sued by former clients would prevent him from taking the side of a client in a fee dispute with a former law firm, because doing so might "put at risk" his ability to secure business from the lawyers and law firms whose business he solicits. SeLegue had no duty to disclose his business relationships under the MFAA and the BASF Rules, which he

presumably believed applicable, but he would have a duty to disclose those relationships under the CAA.

In finding "no reason to interpret the appearance-of-partiality rule more broadly in the context of arbitrator disclosure than in the context of judicial recusal" (*Haworth, supra,* 50 Cal.4th at p. 393), the Supreme Court was considering two arguments: First, that the standard for arbitrator disclosure should be broader than that for judicial recusal in that "all doubts should be resolved in favor of disclosure" and, second, that the disclosure requirement for arbitrators should be based on the party's perspective rather than the perspective of an " 'objective, reasonable person.' " (*Id.* at p. 392.) *Haworth* rejected these arguments, explaining that the disclosure requirements were intended to ensure the impartiality of the arbitrator, not to mandate disclosure of "all matters that a party might wish to consider in deciding whether to oppose or accept the selection of an arbitrator." (*Id.* at p. 393.) The interpretation sought in *Haworth,* the court concluded, would place an unreasonable burden on the arbitrator to "identify and disclose all events in the arbitrator's past, including those not connected to the parties, the facts, or the issues in controversy, that conceivably might cause a party to prefer another arbitrator." (*Id.* at p. 394.) This would undermine the finality of arbitration awards by subjecting them to "after-the-fact attacks by losing parties searching for potential disqualifying information only after an adverse decision has been made." (*Id.* at pp. 394–395.)

These problems are not presented here. Kors is not seeking disclosure of all matters that might make her prefer a different arbitrator or asking us to depart from the standard of an objective person. Her contention is simply that an objective person could reasonably question the impartiality of an arbitrator in a dispute over legal fees who, at the time of the arbitration, was engaged generally in the defense of attorneys and law firms in cases involving professional responsibility and was actively representing a law firm in a case before the California Supreme Court involving a dispute over legal fees. To the extent the disclosure sought here is "broader" than what would be required of a judge, it is only because the circumstances here could not arise in the judicial arena, where a sitting judge could not simultaneously represent parties of the same class as one of the parties to the litigation.

██ We are mindful that " ' "ordinary and insubstantial business dealings" ' arising from participation in the business or legal community do not necessarily require disclosure." (*Luce, Forward, Hamilton & Scripps, LLP v. Koch* (2008) 162 Cal.App.4th 720, 733 [75 Cal.Rptr.3d 869], quoting *Guseinov v. Burns* (2006) 145 Cal.App.4th 944, 959 [51 Cal.Rptr.3d 903].) So, too, do we recognize that arbitrators "cannot sever all their ties [to] the business world." (*Ceriale v. AMCO Ins. Co.* (1996) 48 Cal.App.4th 500, 505

[55 Cal.Rptr.2d 685].) "Because arbitrators are selected for their familiarity with the type of business dispute involved, they are not expected to be entirely without business contacts in the particular field." (*Ray Wilson Co. v. Anaheim Memorial Hospital Assn.* (1985) 166 Cal.App.3d 1081, 1087–1088 [213 Cal.Rptr. 62], disapproved of on another ground in *Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at pp. 27–28.) However, to the extent these relationships are substantial and involve financial considerations creating an impression of possible bias, they must be disclosed. Like the Supreme Court, "[w]e can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." (*Commonwealth Corp. v. Casualty Co., supra,* 393 U.S. at p. 149.)

For the foregoing reasons, we conclude that had it applied, section 1281.9 would have required SeLegue to timely disclose to the parties the nature of his legal practice, including the fact that he was then representing a law firm engaged in a fee dispute with a former client. An arbitrator's failure to disclose facts as required by section 1281.9 warrants vacation of his or her award. (§ 1286.2, subd. (a)(2), (6); *Casden Park La Brea Retail LLC v. Ross Dress for Less, Inc.* (2008) 162 Cal.App.4th 468, 476–477 [75 Cal.Rptr.3d 763]; *Michael v. Aetna Life & Casualty Ins. Co., supra,* 88 Cal.App.4th at pp. 937–938.) As stated in *Ovitz v. Schulman* (2005) 133 Cal.App.4th 830 [35 Cal.Rptr.3d 117], "the statute leaves no room for discretion. If a statutory ground for vacating the award exists, the trial court *must* vacate the award." (*Id.* at p. 845, italics added; accord, *Guseinov v. Burns, supra,* 145 Cal.App.4th at p. 957; *International Alliance of Theatrical Stage Employees, etc. v. Laughon* (2004) 118 Cal.App.4th 1380, 1386–1387 [14 Cal.Rptr.3d 341].) It necessarily follows that Kors was prejudiced by the erroneous order for arbitration under BASF's mandatory fee arbitration program rules, which deprived her of the benefit of section 1281.9.

## II.

### Kors's Right to Attorney Fees for Enforcing the Arbitration Agreement

The parties' fee agreement provided that "[t]he prevailing party in any arbitration or litigation pertaining to [any fee] dispute may recover the full value of attorney's fees incurred in any dispute over enforcement of this agreement, even if any party hereto represents itself." On October 23, 2007, after the trial court granted her petition to compel arbitration, Kors moved for an award of attorney fees for enforcing the arbitration provision of the fee agreement.

Kors relied upon a line of cases awarding attorney fees after a petition to compel arbitration, but principally on *Acosta, supra,* 150 Cal.App.4th 1124. Opposing the fee request, BWM argued that Kors misinterpreted *Acosta* and urged the court to instead apply the rule, set forth in *Lachkar v. Lachkar* (1986) 182 Cal.App.3d 641, 648–649 [227 Cal.Rptr. 501], that an order compelling arbitration does not provide a basis upon which to award attorney fees because it does not finally dispose of the rights of the parties and permit determination of the prevailing party.

In *Acosta,* in response to a complaint filed by his lessor, Kerrigan filed a petition to compel arbitration under a provision in an occupancy agreement, stating that " '[a]ny dispute regarding any aspect of this Occupancy Agreement or an act which allegedly has or would violate any provision of this Occupancy Agreement . . . will be submitted to arbitration . . . as the exclusive remedy for such claim or dispute.' " (*Acosta, supra,* 150 Cal.App.4th at p. 1126.) When he eventually succeeded in compelling arbitration, Kerrigan requested attorney fees pursuant to a provision of the occupancy agreement declaring that, " '[s]hould any party to this Agreement hereafter institute any legal action or administrative proceeding against the other by any method other than said arbitration, the responding party shall be entitled to recover from the initiating party all damages, costs, expenses, and attorneys' fees incurred as a result of such action.' " (*Id.* at p. 1129.) "In his motion, Kerrigan asserted his 'entitlement to recover fees is immediate upon successfully moving the case[] to arbitration—as Kerrigan now has done— and is enforceable now whether or not Kerrigan is ever a "prevailing party" on the merits at the conclusion of the arbitration proceedings.' " (*Id.* at p. 1126.) In opposition, Acosta argued that there was no authority for an interim fee award before the prevailing party is identified, and that Kerrigan's fee request should be subject to arbitration in the same manner as his claims against Kerrigan. (*Id.* at pp. 1126–1127.)

*Acosta* affirmed the trial court's determination that it had jurisdiction to decide Kerrigan's claim for attorney fees and could do so before completion of the arbitration and identification by the arbitrator of a prevailing party on the merits. (*Acosta, supra,* 150 Cal.App.4th at p. 1125.) The appellate court viewed the question whether the court or the arbitrator should decide the attorney fees issue as extremely close because the agreement so broadly directed arbitration of "any dispute" concerning the agreement. It concluded, however, that because the court had to decide the petition to compel arbitration, "the court also should decide a request for [attorney] fees *made in connection with that same petition.* Indeed the request for attorney fees is so closely related to the hearing and decision of the petition to compel as to be reasonably considered an integral part of that proceeding which even under the contract is necessarily a judicial not an arbitral proceeding." (*Id.* at pp. 1130–1131.)

With respect to the question most relevant to the present case, *Acosta* found "no valid reason why Kerrigan should have to wait until the end of the case to recover fees he is entitled to by virtue of prevailing on [the merits of] a specific motion. Kerrigan is not attempting to recover attorney fees under a provision permitting an award of fees to the party prevailing on the merits of a claim arising under the Occupancy Agreement. Rather, he is seeking fees incurred while enforcing an independent provision of the contract, fees to which he is entitled even if he loses the case on the merits in the arbitration. A party who is entitled to recover attorney fees he or she incurred in making a successful discovery motion need not wait until the end of the case before filing the claim for fees. A fortiori, Kerrigan is entitled to an interim attorney fee award in this case where he already has prevailed on an independent proceeding contemplated by the contract." (*Acosta, supra*, 150 Cal.App.4th at p. 1132, fns. omitted.)

In denying Kors's motion for attorney fees, the trial court distinguished *Acosta* on the ground that the court in that case "awarded fees for enforcing an independent provision of the contract, 'fees to which he is entitled even if he loses the case on the merits in the arbitration.' There is no such provision in the case at bar." BWM emphasizes that "[i]n addition to a standard clause allowing for the recovery of fees by the prevailing party in an arbitration, there was [in the *Acosta* agreement] a separate clause stating that, should any party institute a proceeding other than by arbitration, the responding party was entitled to recovery of all attorney's fees for that action." (See *Acosta, supra*, 150 Cal.App.4th at p. 1126.) *Acosta* is irrelevant, BWM maintains, because the fee agreement in this case contains no clause specifically authorizing recovery of attorney fees incurred as a result of an action to enforce the duty to arbitrate.

In our view, this distinction is not meaningful. The independent provision of the agreement in *Acosta*, which Kerrigan enforced by moving to compel arbitration—that arbitration was the exclusive remedy for any dispute arising under the occupancy agreement—is functionally equivalent to the provision of the agreement before us that "[a]ny dispute pertaining to the fees owed under this agreement will be . . . submitted to binding arbitration . . . ." Similarly, the provision of the present fee agreement entitling the prevailing party in any litigation "pertaining to the fees owed under this agreement" to recover attorney fees "incurred in any dispute over enforcement of this agreement" is analogous to the provision of the agreement in *Acosta* creating a right to recover attorney fees for prevailing in " '[a]ny dispute regarding any aspect of [the] Occupancy Agreement.' " (*Acosta, supra*, 150 Cal.App.4th at p. 1126.)

The provision in *Acosta* that BWM finds missing here, which provided for attorney fees to the responding party if a party instituted a proceeding other

than arbitration, was treated as expressly authorizing attorney fees for a party forced to file a petition to compel arbitration. (*Acosta, supra*, 150 Cal.App.4th at p. 1132.) But the provision in the agreement here that "[t]he prevailing party in any arbitration or litigation pertaining to [any fee] dispute may recover the full value of attorney's fees incurred *in any dispute over enforcement of this agreement* . . ." (italics added) amounts to the same thing. Kors's petition to compel arbitration of the fee dispute, which was filed in and sought to stay BWM's suit for breach of the fee agreement, "pertain[ed] to the fees owed under [the fee] agreement" and had "the purpose of enforcing the provisions of [the fee] agreement." Indeed, Kors's pleading was entitled "Motion to Enforce Arbitration Agreement and Stay Action." The language of the present agreement providing for attorney fees incurred in enforcing the agreement to arbitrate authorized fees incurred in moving to compel arbitration as directly as did the language of the provision in *Acosta*.

In *Acosta*, Kerrigan's accurate characterization of his entitlement to attorney fees *immediately*—i.e., that the right " 'is enforceable now whether or not [he] is ever a "prevailing party" on the merits at the conclusion of the arbitration' "—was not explicitly set forth in the occupancy agreement, and nothing in *Acosta* suggests it needed to be. (*Acosta, supra*, 150 Cal.App.4th at p. 1126.) The flaw in BWM's argument is the manifestly untenable assumption that the provision of the parties' fee agreement establishing the right of a prevailing party to "recover the full value of attorney's fees incurred *in any dispute over enforcement of this agreement*" (italics added) refers *only* to disputes relating to the amount of fees Kors owes BWM, if any, and not to disputes over enforcement of the arbitration provision. Neither the text of the agreement nor the law nor reason supports such a restrictive construction.

■ Other case law supports this conclusion. *Otay River Constructors v. San Diego Expressway* (2008) 158 Cal.App.4th 796 [70 Cal.Rptr.3d 434] (*Otay*) held that "[w]here an action is brought solely to compel arbitration of contractual disputes between the parties, . . . (1) a party who succeeds in obtaining an order denying the petition to compel arbitration is a prevailing party in the action on the contract even though the merits of the parties' underlying contractual disputes have not yet been resolved, and (2) an order denying a request for costs and attorney fees under such circumstances is appealable as a 'special order after final judgment' under Code of Civil Procedure section 1294, subdivision (e)." (*Id.* at p. 799.) The trial court in *Otay*, after denying a motion to compel arbitration, denied the opposing party's motion for attorney fees and costs on the basis that it was not a prevailing party because continuing litigation was contemplated.

The Court of Appeal reversed, concluding that the motion to compel arbitration was an "action on the contract" for purposes of Civil Code section

1717.[18] The court explained that "[s]ection 1293.2 [(which pertains to costs in arbitration proceedings)] provides that '[t]he court shall award costs *upon any judicial proceeding under this title* as provided in Chapter 6 (commencing with Section 1021) of Title 14 of Part 2 of this code.' (Italics added.) Section 1033.5, part of part 2, title 14, chapter 6 of the Code of Civil Procedure, provides that attorney fees authorized by contract are recoverable as an item of costs. [Citations.] A petition to compel arbitration under section 1281.2 is a judicial proceeding covered by this provision." (*Otay, supra*, 158 Cal.App.4th at p. 805.) In response to the argument that a party who obtains an interim procedural victory cannot be deemed a prevailing party entitled to attorney fees, *Otay* pointed out that "courts have awarded attorney fees to a party obtaining an appealable order or judgment in a discrete legal proceeding even though the underlying litigation on the merits was not final." (*Id.* at p. 807, citing *Christensen v. Dewor Developments* (1983) 33 Cal.3d 778, 786–787 [191 Cal.Rptr. 8, 661 P.2d 1088], *Marcus & Millichap Real Estate Investment Brokerage Co. v. Woodman Investment Group* (2005) 129 Cal.App.4th 508, 510–513 [28 Cal.Rptr.3d 584] and *Cole v. BT & G, Inc.* (1983) 141 Cal.App.3d 995, 996–998 [190 Cal.Rptr. 690].)

In the present case, as in *Otay*, the petition to compel arbitration under the parties' agreement was an "action on the contract" for purposes of Civil Code section 1717. Kors obtained an unqualified victory on the only contract claim at issue in the action—whether to compel arbitration under the fee agreement. Accordingly, Kors was the prevailing party as a matter of law because she defeated the only contract claim before the trial court in that discrete special proceeding. (*Otay, supra*, 158 Cal.App.4th at p. 807.)

BWM attempts to distinguish *Otay* and *Christensen v. Dewor Developments* on the ground that they involved the denial of petitions to compel arbitration, not the granting of such a request, as in the present case. BWM offers no reason why a party whose petition to compel arbitration succeeds may be denied attorney fees when a party who defeats such a petition is entitled to receive such an award. If a motion to compel arbitration is an "action on the contract" that will support an attorney fee award, we can conceive of no reason why it should matter whether the prevailing party succeeded in advancing the motion or in defeating it. Focusing upon an analytically irrelevant factor, BWM ignores the salient point, which is whether the relief sought and obtained by the party seeking fees under the arbitration clause enforced the agreement in which the clause appears.

---

[18] Civil Code section 1717, subdivision (a), provides in pertinent part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the party prevailing, then the party who is determined to be the prevailing party on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

*Turner v. Schultz* (2009) 175 Cal.App.4th 974 [96 Cal.Rptr.3d 659] adopted the reasoning of *Otay* and *Acosta* in an opinion affirming an award of attorney fees to a party whose petition to compel arbitration succeeded. When his employment was terminated, Turner sought to avoid the arbitration called for in the contract governing the company's buyout of his stock. (*Id.* at p. 977.) Turner filed an action in Contra Costa County alleging the contract was fraudulently induced and a separate action in San Francisco County seeking to prevent the arbitration from going forward without a court order. (*Id.* at pp. 977–978.) The Contra Costa court granted the defendants' petition to compel arbitration and the defendants subsequently obtained judgment on the pleadings and an award of attorney fees in the San Francisco case, which was concerned only with the question whether the arbitration should proceed. (*Id.* at pp. 978–979.)

 Affirming, the Court of Appeal held that regardless which party prevailed in the subsequent arbitration, there was a prevailing party for purposes of Civil Code section 1717 in this discrete proceeding. (*Turner v. Schultz, supra,* 175 Cal.App.4th at pp. 983–984.) Rejecting Turner's arguments that the action was not " 'on the contract' " and the party who prevailed under the agreement could not be determined "until after the final resolution of the underlying dispute—that is, until after the arbitration is complete," the court explained that "California courts construe the term 'on the contract' liberally. ' "As long as the action 'involve[s]' a contract it is ' "on [the] contract" ' within the meaning of section 1717. [Citations.]" [Citations.]' [Citation.] Where an attorney fee clause provides for an award of fees incurred in enforcing the contract, the prevailing party is entitled to fees for any action 'on the contract,' whether incurred offensively or defensively. [Citations.] Such fees are properly awarded under section 1717 'to the extent that the action in fact is an action to enforce—or avoid enforcement of—the specific contract.' [Citation.] An action for declaratory relief can be an action 'on a contract.' [Citations.] In this action, Turner sought declaratory and injunctive relief to avoid enforcement of the agreement's arbitration provision absent an order compelling arbitration. Under these circumstances, we conclude that this action was on the contract for purposes of an award of attorney fees." (*Turner v. Schultz,* at pp. 979–980.)

The basis upon which BWM tries to distinguish *Turner*—the fact that the case "involved two separate and distinct lawsuits"—is as weak as the bases upon which it attempts to distinguish *Acosta* and *Otay*. Nothing in the *Turner* opinion suggests that it mattered to the court that the fees incurred in resisting Turner's efforts to avoid arbitration were awarded in an action separate from the one in which the petition to compel arbitration was granted. BWM offers no reason why this factor should bar an interim award of attorney fees and we cannot think of one.

Nor are we impressed with BWM's reliance on *Lachkar v. Lachkar, supra,* 182 Cal.App.3d 641. The *Lachkar* court declined to award attorney fees to a party that had prevailed on a petition to compel arbitration because there had been no " 'reckoning of the net success' of the parties" and therefore no prevailing party under Civil Code section 1717. (*Lachkar,* at p. 649.) *Acosta* distinguished *Lachkar,* stating, "Kerrigan is not attempting to recover attorney fees under a provision permitting an award of fees to the party prevailing on the merits of a claim arising under the Occupancy Agreement. Rather, he is seeking fees incurred while enforcing an independent provision of the contract, fees to which he is entitled even if he loses a case on the merits in the arbitration." (*Acosta, supra,* 150 Cal.App.4th at p. 1132, fn. omitted.) *Acosta* noted that the party who filed the successful petition to compel arbitration in *Lachkar* "was not entitled to [an] interim award of attorney fees incurred in connection with that petition under Civ. Code § 1717 because, at the time the award was made, 'there was no prevailing party pursuant to that statute." (*Acosta,* at p. 1132, fn. 16.) As pointed out in *Turner,* "*Lachkar* was decided under an earlier version of section 1717, under which the 'prevailing party' was defined as, with certain exceptions, 'the party who is entitled to recover costs of suit.' (Stats. 1983, ch. 1073, § 1, pp. 3785–3786; see *Lachkar, supra,* 182 Cal.App.3d at p. 648.) Section 1717, subdivision (b)(1) now defines 'the party prevailing on the contract' as 'the party who recovered a greater relief in *the action on the contract.*' (Italics added.) This language suggests that where, as here, there is a discrete action 'on the contract,' attorney fees are available to the party who achieved greater relief in that action." (*Turner v. Schultz, supra,* 175 Cal.App.4th at p. 984, fn. 5; see also *Acosta, supra,* 150 Cal.App.4th at p. 1132, fn. 16.)[19]

"[A] party who prevails on a petition to compel arbitration has an immediate right to make a claim for the attorney fees [s]he incurred in getting the trial court to move the controversy to arbitration." (*Acosta, supra,* 150 Cal.App.4th at p. 1132.) Kors was forced to file a petition to compel arbitration in response to BWM's complaint because BWM refused to abide by the arbitration clause in the fee agreement it presented to Kors. Like the *Acosta* court, we do not believe a person who incurred attorney fees in vindicating a contractual right should be forced to file a separate claim in arbitration in order to recover those expenses. (*Id.* at p. 1133.)

---

[19] It may also be noted that subdivision (a) of Civil Code section 1717 now provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing *on the contract,* whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Italics added.) The italicized words were not in the version of section 1717 in effect at the time *Lachkar* was decided. (Stats. 1983, ch. 1073, § 1, p. 3785.)

For the foregoing reasons, we conclude that the order denying Kors's motion for an award of attorney fees incurred in her successful petition to compel arbitration was error.

## DISPOSITION

The trial court order granting BWM's petition to confirm the arbitration award and denying Kors's petition to vacate the award is reversed as to both rulings. The case is remanded to the superior court with directions to grant Kors's motion to vacate the arbitration award and consider any request by the parties to take further action not inconsistent with this opinion.

The order denying Kors an award of attorney fees incurred in connection with her successful petition to compel arbitration is also reversed. Upon remand, the court should award Kors fees reasonably incurred in advancing the merits of that petition in the trial court and upon this appeal, in addition to other costs on appeal.

Haerle, J., and Richman, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 17, 2011, S193960.