Filed 6/30/14  Vitale v. Morgan Stanley Smith Barney CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TODD G. VITALE, et al., | D063033 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2012-00099813-CU-PA-CTL; 37-2012-00099937-CU-PA-CTL) |
| MORGAN STANLEY SMITH BARNEY, LLC, | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of San Diego County, Lisa C. Schall, Judge.  Reversed and remanded with directions.

Boudreau Williams and Jon R. Williams for Plaintiffs and Appellants.

Paul Hastings, William F. Sullivan, D. Scott Carlton, and Timothy D. Reynolds for Defendant and Respondent.

Todd G. Vitale and John P. Paladino (together Appellants) appeal an order vacating a $4,965,016.54 arbitration award in Appellants' favor against Morgan Stanley Smith Barney, LLC (Morgan Stanley).  Appellants contend the superior court erred in finding that one of the three arbitrators on the panel did not make all objectively

reasonable disclosures required under the Financial Industry Regulatory Authority (FINRA) arbitration rules. They also argue that Morgan Stanley was aware of all the allegedly nondisclosed facts prior to the subject arbitration.

Although we conclude the arbitrator failed to make certain disclosures, these undisclosed facts could not cause an objective observer to doubt the arbitrator's impartiality. In addition, we determine Morgan Stanley was aware of certain key facts, namely its efforts to recruit two of the arbitrator's coworkers, and thus the arbitrator was not required to disclose those facts. We reject Morgan Stanley's argument that the arbitrator's failure to disclose that the two coworkers recruited by Morgan Stanley were his sons-in-law or that he had a poor relationship with one of the recruited coworkers, who now works at Morgan Stanley, but played no role in the subject arbitration, justified the order vacating the arbitration award. We therefore reverse the order vacating the arbitration award with directions to the superior court to enter an order confirming the arbitration award. Because we reverse that order, we do not reach Appellants' appeal of the order denying their motion for reconsideration.

FACTUAL AND PROCEDURAL BACKGROUND

Morgan Stanley recruited Appellants away from UBS Securities, and Appellants have worked for Morgan Stanley as investment advisors since 2008. Appellants contended that they were induced to join Morgan Stanley based on express promises made by Morgan Stanley management that: (1) Vitale would become a salaried sales manager within six months of joining Morgan Stanley and a branch manager within a year of joining the firm; and (2) once Vitale transitioned his clients to Morgan Stanley

2

and became a salaried manager, Paladino would take over his and Vitale's combined books of business.

Morgan Stanley did not make Vitale a salaried manager. Consequently, Paladino never was able to take over the combined books of business. Thus, Appellants filed an arbitration demand, under FINRA,[1] against Morgan Stanley. They alleged, among others, claims for breach of oral and written contract, negligent misrepresentation, and fraud, and sought damages in an amount according to proof. Morgan Stanley did not file any counterclaims against Appellants.

After receiving the arbitration demand, FINRA sent a standard letter directing the parties to rank prospective arbitrators to serve on a panel of three arbitrators, which would include an industry insider (a person who works in the securities industry). FINRA provided the parties with three lists of 10 arbitrators each, on which Barry E. Kersh appeared as one of the proposed industry arbitrators.

Kersh's biographical profile stated he had been employed by Southwest Securities, Inc. (Southwest) and its predecessor, M.L. Stern & Co., since 1980 as the senior vice president and San Diego branch manager. His profile also listed the fact that Kersh served on a panel for at least three other FINRA arbitrations involving Morgan Stanley.

---

[1] FINRA is the federally created successor to the National Association of Securities Dealers and is the exclusive forum for disputes between registered representatives and their employing brokerage firms. FINRA is a regulatory entity that has its own Security and Exchange Commission approved rules and procedures, including rules and procedures for conducting FINRA arbitrations.

FINRA appointed the final arbitration panel on September 9, 2011. FINRA's letter to the parties requested that they voluntarily exchange, in writing, known information concerning potential conflicts between the arbitrators and any party, counsel or witness. Morgan Stanley did not advise Appellants' trial counsel or FINRA of any potential conflicts or relationships with Kersh. The final three arbitrator panel consisted of Robert M. Lubin, Randall Brian Christison (both attorneys), and Kersh.

Kersh submitted his arbitrator's oath and disclosure checklist, which FINRA forwarded to the parties. The checklist included 33 questions. Of importance here are question Nos. 8, 9, and 17. Question No. 8 states: "Have you, your spouse, or any member of your immediate family maintained an account individually, jointly or beneficially with a brokerage firm named in this proceeding?" (Fn. omitted.) In a footnote, the checklist defines "immediate family" as "(i) a person's parent, stepparent, child, or stepchild; (ii) a member of a person's household; (iii) an individual to whom a person provides financial support of more than 50 percent of the individual's annual income; or (iv) a person who is claimed as a dependent for federal income tax purposes." The definition of immediate family does not include in-laws, but the footnote defining immediate family does address in-laws: "To the extent you have knowledge, please also consider the employment, financial, and other interests of your mother, father, son and daughter in-laws when answering questions on this form referring to family members. You are not required to seek out the information about your in-laws in responding to this form." Question No. 9 states: "Are you employed by, or the spouse or an immediate family member of a person who is employed by, an entity that directly or indirectly

4

controls, is controlled by, or is under common control with, any partnership, corporation, or other organization that is engaged in the securities business?" Question No. 17 states: "Has any member of your immediate family or household been employed by a brokerage firm?"

Kersh responded in the negative to both question Nos. 8 and 17. In response to question No. 9, he indicated that he was employed by Southwest. He did not list any other immediate family members who were or had been employed in the securities industry.

A few months later, days before the arbitration hearing began, Kersh submitted another disclosure indicating he had very recently sat on another FINRA arbitration panel where Shustak Frost & Partners (who represented Appellants in the arbitration) represented Oliver Schwarz, a Morgan Stanley financial advisor, in his claims against Morgan Stanley arising out of Morgan Stanley's recruitment of Schwarz. Kersh further disclosed that two of Appellants' listed witnesses (Morgan Stanley representative Michael Melton and expert witness Norm Kjono) also had testified in the Schwarz case. In addition, Kersh revealed that he knew Russ Smith, another Morgan Stanley officer and branch manager.

Moreover, on the first day of hearings, Kersh advised the parties that he recognized "one or two" individuals from the parties' witness lists as "being in the industry." None of the parties inquired about these individuals.

At the close of the seven-day arbitration, Appellants' counsel asked the panel for $6,550,053.93 in damages, including both compensatory and punitive damages as well as

5

discovery sanctions and attorney fees. The three person arbitration panel unanimously sided with Appellants, but awarded them $4,965,016.54 (comprised of $4.6 million in compensatory damages; $354,816.54 in attorney fees; $200 as reimbursement for filing fees; and $10,000 as discovery sanctions).

Appellants and Morgan Stanley brought competing petitions to confirm and to vacate the arbitration award, respectively. They then agreed to combine their respective briefing on those petitions for the convenience of the parties and the superior court.

Morgan Stanley's primary complaints about the arbitration award were: (1) Kersh failed to disclose that his son-in-law, Matthew Childs, was an advisor working with Morgan Stanley in the San Diego area, and had been recruited to work for Morgan Stanley from Southwest, where Kersh works; (2) Childs and Kersh's daughter, Mandy Childs (Mandy),[2] were in the midst of a contentious marital separation; (3) Kersh's other son-in-law, Andrew Harvey, who works with Kersh at Southwest was aggressively recruited by Morgan Stanley, albeit unsuccessfully; and (4) Mandy allegedly had one or more investment accounts at Morgan Stanley. In raising those contentions, Morgan Stanley added: "Members of the [Morgan Stanley] management team involved in the recruitment of Mr. Childs and Mr. Harvey were involved in the events underlying the arbitration proceedings, some of them even testified at the arbitration."

---

[2]     We use Mandy Childs's first name for the sake of clarity and because she shares the same last name as Matthew Childs. No disrespect is intended.

6

In support of its petition to vacate, Morgan Stanley submitted sworn declarations from Mark Kremers, a Morgan Stanley San Diego based officer and manager. Kremers admitted that before the arbitration started or arbitrators were selected, he knew that Morgan Stanley recruited Childs away from Southwest and attempted to recruit Harvey from Southwest. Specifically, Kremers attested that he is a complex manager in Morgan Stanley's La Jolla branch office, and confirmed that he, along with other Morgan Stanley managers John Simmons, Michael Melton, and Russ Smith, successfully recruited Childs away from Southwest in Fall 2010. Kremers further admitted that he, along with Smith and Robert Lakosil, attempted to recruit Harvey, in 2010 and 2011, also from the same Southwest branch for which Kersh worked.

In opposition, Appellants, submitted declarations from Michael Ferrante, Smith, and Simmons. Ferrante is a former branch manager of Morgan Stanley's downtown San Diego branch office. Smith is a former branch manager of Morgan Stanley's Rancho Bernardo office. Simmons is Morgan Stanley's former regional director for Southern California and Hawaii. Ferrante, Smith, and Simmons were involved in some way with the recruitment of Childs from Southwest to Morgan Stanley, and all three stated that it was known to them and others at Morgan Stanley that Childs worked for his father-in-law, Kersh, at Southwest. Ferrante, Smith, and Simmons stated that Melton was heavily involved in the recruitment of Childs. Ferrante stated he met with Childs along with Kremers for dinner where Childs made it clear that he wanted to leave his then current employer because he no longer wanted to work for his father-in-law, Kersh. Smith

7

attested that he had at least one meeting with Childs and Melton where Childs discussed the same motivation for wanting to join Morgan Stanley.

Those declarations also confirmed that when Morgan Stanley recruited Harvey, Morgan Stanley San Diego branch managers and its regional director also knew Harvey worked with, and was a son-in-law of, Kersh.

In reply to Appellants' opposition, Morgan Stanley submitted an additional declaration from Kremers and a declaration from Melton. Although both declarants had been involved with the recruitment of Childs, they stated they did not know that Childs was Kersh's son-in-law until after the arbitration award was issued in this matter. Morgan Stanley also submitted the declaration of Robert Hampton, Morgan Stanley's executive director of human resources of the western division. Among other things, Hampton attested: (1) Morgan Stanley had terminated Ferrante on August 24, 2010 and Ferrante is currently involved in litigation with Morgan Stanley; (2) Morgan Stanley terminated Simmons on May 9, 2011 and Simmons is currently involved in litigation with Morgan Stanley; and (3) Morgan Stanley had demoted Smith and he resigned from Morgan Stanley on November 11, 2011.

After considering the pleadings, evidence, and hearing oral argument, the superior court issued a written order granting Morgan Stanley's petition to vacate the arbitration award. The court found that Kersh failed to comply with FINRA rule 13408 in his responses to question Nos. 8 and 17. The court also determined that Appellants had not proven that "Kersh's relationships to Morgan Stanley" were known by Morgan Stanley. In addition, the court largely disregarded the declarations from Ferrante, Smith, and

8

Simmons, "whose testimony is questionable in terms of bias as former employees with a potential axe to grind against Morgan Stanley." Accordingly, the court vacated the arbitration award under Code of Civil Procedure section 1286.2.[3]

Appellants subsequently moved for reconsideration of the court's order. They contended they had discovered new facts, namely Childs contacted one of Appellants' attorneys and told him many employees and managers at Morgan Stanley knew that Childs was Kersh's son-in-law and Childs wanted to leave Southwest because of his strained relationship with Kersh. In addition, Appellants offered evidence that Kersh's daughter had not worked for a brokerage firm and never opened an account at Morgan Stanley.

The court denied the motion for reconsideration, finding that Appellants did not offer any new facts that were unknown or could not reasonably be known prior to Appellants filing their opposition to Morgan Stanley's petition to vacate the arbitration award.

Appellants timely appealed both the order granting Morgan Stanley's motion to vacate and the order denying their motion for reconsideration.

## DISCUSSION

Appellants challenge two orders from the superior court. The first is the court's order vacating the arbitration award. They argue that the arbitrator, Kersh, made all objectively reasonable disclosures required under FINRA arbitration rules and Morgan

---

[3] Statutory references are to the Code of Civil Procedure unless otherwise specified.

9

Stanley was aware of the allegedly nondisclosed facts. The second is the court's order denying Appellants' motion for reconsideration of the order vacating the arbitration award. Appellants maintain the court incorrectly concluded they had not provided any new evidence.

I

*THE ORDER VACATING THE ARBITRATION AWARD*

A. Legal Framework

Judicial review of a petition to vacate an arbitration award in both the trial court and on appeal is limited to the statutory grounds found in section 1286.2. (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 981-982.) The reason for such limited judicial review is that an "arbitration decision is final and conclusive because the parties have agreed that it be so." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10 (*Moncharsh*), italics omitted.) Arbitration by agreement is often a "process in which parties voluntarily trade the safeguards and formalities of court litigation for an expeditious, sometimes roughshod means of resolving their dispute." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 831 (*Vandenberg*).) Because "arbitral finality is a core component of the parties' agreement to submit to arbitration" (*Moncharsh*, *supra*, at p. 10), and because arbitrators are not required to make decisions according to the rule of law, parties to an arbitration agreement accept the risk of arbitrator errors (*id*. at p. 12), and arbitrator decisions cannot be judicially reviewed for errors of fact or law even if the error is apparent and causes substantial injustice (*id*. at pp. 11, 33; see *Vandenberg*, *supra*, at p. 832). " 'As a

consequence, arbitration awards are generally immune from judicial review.' "
(*Moncharsh*, *supra*, at p. 11.)

Therefore, the authority of the courts to vacate an arbitration award is limited by statute. Courts may vacate an award only when: (1) the award was procured by corruption, fraud, or other undue means; (2) an arbitrator was corrupt; (3) misconduct of the arbitrator substantially prejudiced a party's rights; (4) the arbitrator exceeded his or her powers; (5) an arbitrator's refusal to postpone the hearing or hear material evidence substantially prejudiced the rights of a party; or (6) an arbitrator failed to disclose a ground for disqualification or improperly failed to disqualify himself or herself. (§ 1286.2, subd. (a).) Here, we focus on this last reason.

The parties agree Kersh's disclosures were governed by FINRA arbitration rules. FINRA rule 13408 imposes a duty on the potential arbitrator to disclose "any circumstances which might preclude the arbitrator from rendering an objective and impartial determination." As relevant here, FINRA rule 13408 requires arbitrators to disclose:

> "Any existing or past financial, business, professional, family, social, or other relationships or circumstances with any party, any party's representative, or anyone who the arbitrator is told may be a witness in the proceeding, that are likely to affect impartiality or might reasonably create an appearance of partiality or bias; [and] [¶] Any such relationship or circumstances involving members of the arbitrator's family or the arbitrator's current employers, partners, or business associates."

Additionally, under FINRA, each arbitrator is required to complete a disclosure checklist. The disclosure checklist prompts the arbitrator to consider topics and

11

relationships that are likely to create the impression of bias. Under FINRA arbitration rules, the arbitrator is required to affirm the accuracy of any disclosure with a signed oath. FINRA rule 13408(b) explains that "the obligation to disclose interests, relationships, or circumstances that might preclude an arbitrator from rendering an objective and impartial determination described in [FINRA Rule 13408(a)] is a continuing duty that requires an arbitrator . . . to disclose, at any stage of the proceeding, any such interests, relationships, or circumstances that arise, or are recalled or discovered."

FINRA's disclosure requirements are consistent with section 1281.9, which requires the proposed arbitrator to "disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial." If a party petitions the superior court to vacate an arbitrator's award and the court finds that the arbitrator "failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware" (§ 1286.2, subd. (a)(6)(A)), the court must vacate the award. (§§ 1286.2, subd. (a); 1286.4, subd. (a).) Vacation of the arbitrator's award is required in those circumstances, and no prejudice need be shown. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 394 (*Haworth*).)

*Haworth*, *supra*, 50 Cal.4th 372 is instructive on the relevant standard to evaluate Kersh's alleged failure to disclose here. In *Haworth*, our Supreme Court considered whether a former judge, serving as an arbitrator, was required to disclose that 10 years earlier he had been publicly censured based on his statements to court employees. Our

12

high court applied the test that an arbitrator must disclose "all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial." (§ 1281.9, subd. (a).) Then, borrowing from discussions of judicial ethics, the court in *Haworth* explained arbitral impartiality as follows: " 'Impartiality' entails the 'absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind.' [Citation.] In the context of judicial recusal, '[p]otential bias and prejudice must clearly be established by an objective standard.' [Citations.] 'Judges, like all human beings, have widely varying experiences and backgrounds. Except perhaps in extreme circumstances, those not directly related to the case or the parties do not disqualify them.' [Citation.]" (*Haworth*, *supra*, at p. 389.)

As relevant here, the high court further explained that: " 'The "reasonable person" is not someone who is "hypersensitive or unduly suspicious," but rather is a "well-informed, thoughtful observer." ' [Citations.] '[T]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the disinterested objective observer whose doubts concerning the judge's impartiality provide the governing standard.' [Citations.] [¶] 'An impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased for or against a party for a particular reason.' [Citation.]" (*Haworth, supra,* 50 Cal.4th at p. 389; italics omitted.)

13

## B. Standard of Review

If the facts are undisputed, the question whether an arbitrator was required to disclose a particular matter involves the application of the rule requiring disclosure to undisputed facts. This is a mixed question of fact and law. Our review is de novo. (*Haworth*, *supra*, 50 Cal. 4th at pp. 385-386.) To the extent Appellants challenge the superior court's resolution of conflicting evidence to establish a historical or physical fact, we review the resolution under the substantial evidence test. (*Id.* at p. 384.)

## C. Analysis

The superior court vacated the arbitration award on two primary grounds. One, Kersh did not disclose that his daughter had worked for a brokerage firm in the past. Two, Kersh did not disclose that his daughter had investment accounts with Morgan Stanley. Based on these omissions, the court found that Kersh "failed to comply with [FINRA] Rule 13408" because he did not accurately respond to FINRA checklist question Nos. 8 and 17. Absent from the court's order, however, is any explanation regarding how Kersh's failure to make these disclosures would have caused "a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial." (§1281.9, subd. (a); see *Haworth*, *supra*, 50 Cal.4th at p. 389.)

As a threshold matter, we note that the parties spend little time in their respective briefs arguing about these disclosures. Instead, the bulk of the briefs concern Kersh's failure to disclose: (1) Childs and Harvey are his sons-in law; (2) Morgan Stanley recruited both Childs and Harvey from Southwest where Kersh was the branch manager;

14

(3) Kersh had a tumultuous relationship with Childs; and (4) Childs was in the middle of divorce proceedings with Kersh's daughter, Mandy. We will address these issues, but we begin with the disclosures the superior court found Kersh failed to make in violation of FINRA rule 13408, which the court relied on to vacate the arbitration award.

### 1. Kersh's Daughter's Employment

The only evidence in the record that Kersh's daughter, Mandy, worked for a brokerage firm is found in Childs's declaration that he met Mandy at M.L. Stern & Co., Inc. where she worked as Kersh's sales assistant.[4] Although Childs does not indicate when she was so employed, it is apparent that it occurred prior to May 4, 2003 when Childs and Mandy married. The court's order offers no explanation why this omitted disclosure would disqualify Kersh, and Morgan Stanley offers no justification as well. Further, FINRA's "Dispute Resolution Arbitrator's Guide" includes several sections dealing with arbitrator disclosures and disqualifications. It makes clear that "[n]ot every disclosure results in the arbitrator being removed from service on a case." As such, each question on the FINRA checklist does not create a disqualifying event or circumstance under FINRA rule 13408. Put differently, an arbitrator's failure to disclose a fact under the checklist does not automatically disqualify the arbitrator. Instead, we turn to California law to determine if Kersh's response to checklist question No. 17 warrants his disqualification.

---

[4] We realize that as part of their motion for reconsideration, Appellants offered evidence that Kersh's daughter had not worked for a brokerage firm. However, for purposes of our analysis here, we need not resolve this apparent factual dispute, and assume that Kersh's daughter worked for Kersh as stated in Childs's declaration.

15

We return to *Haworth*, *supra*, 50 Cal.4th 372 for guidance regarding how to evaluate the effect of Kersh's failure to disclose that his daughter worked for him almost 10 years before the arbitration. We struggle to contemplate how a " 'well-informed, thoughtful observer' " (*Haworth*, *supra*, at p. 389) could view Kersh as possibly biased against Morgan Stanley based on the fact that his daughter worked for him in some capacity almost 10 years prior to the subject arbitration. Mandy's former employment has no relationship to the subject matter of the arbitration and provides no basis on which any person could reasonably believe this fact would make Kersh biased in the instant arbitration. (See § 1286.2, subd. (a)(6); *Haworth*, *supra*, at pp. 390-391 [holding a person aware of all the circumstances of the arbitrator's public censure 10 years earlier based on his derogatory comments regarding women could not reasonably entertain a doubt concerning the arbitrator's ability to be fair to female litigants].)

### 2. *Mandy's Accounts With Morgan Stanley*

Likewise, we are not concerned by Kersh's failure to disclose that Mandy held investment accounts with Morgan Stanley. Again, the unique context of this fact in relation to the arbitration is important. The only evidence in the record that Mandy had an account with Morgan Stanley comes from Childs's declaration in which he attests that he has a joint account with his wife at Morgan Stanley and she also had an IRA account. If anything, the fact that Mandy has an account with Morgan Stanley might possibly lead a reasonable observer to believe Kersh could be biased in favor of Morgan Stanley. However, there is nothing in the record that shows the arbitration award here would impact Mandy's accounts in any way. And Appellants do not contend Kersh would be

16

biased against them based on Mandy's accounts, and Morgan Stanley fails to offer any cogent argument explaining why the existence of the accounts creates the reasonable perception that Kersh has a bias against Morgan Stanley. Instead, Morgan Stanley implies that if Kersh had disclosed the existence of Mandy's accounts with Morgan Stanley, Morgan Stanley could have investigated the accounts and discovered that Mandy was married to Childs, which in turn would have led Morgan Stanley to discover Kersh's strained relationship with Childs. We reject this tenuous argument, noting, as we discuss in detail below, Morgan Stanley was well aware that it had recruited Childs away from Southwest where he worked with Kersh, but did not deem these facts sufficiently important to warrant further investigation regarding Kersh's possible impartiality. Thus, we fail to see how the disclosure of Mandy's accounts with Morgan Stanley would have led Morgan Stanley to further investigate Kersh when Morgan Stanley's recruitment of Childs away from working with Kersh did not.

Moreover, there is nothing in the record that shows Kersh or Mandy were aware of the existence of the accounts. Morgan Stanley did not produce any print out of the accounts, applications, or signature cards that would clearly indicate Mandy created these accounts. Instead, there is evidence that Morgan Stanley required Childs to transfer both his and his wife's accounts to Morgan Stanley upon his employment there.

In short, we are satisfied that Kersh's failure to disclose Mandy's accounts with Morgan Stanley did not justify the superior court's vacatur of the arbitration award.

17

### 3. *Kersh's Failure to Disclose Information Regarding His Sons-in-Law*

The majority of the briefs before us focus on Kersh's failure to disclose certain facts regarding his sons-in-law. Specifically, Morgan Stanley points out that Kersh did not disclose: (1) Childs is Kersh's son-in-law who worked with Kersh at Southwest; (2) Harvey is Kersh's son-in-law who works with Kersh at Southwest; (3) Morgan Stanley successfully recruited Childs away from Southwest; (4) Morgan Stanley attempted to recruit Harvey away from Southwest; (5) Kersh has a turbulent relationship with Childs; and (6) Childs and Mandy are in the middle of contentious divorce proceedings. These alleged shortcomings were briefed and argued below. However, it does not appear the superior court directly addressed any of these arguments. Instead, in its order, the court found that Appellants did not prove that Morgan Stanley was aware of the relationship between Kersh and Childs. The order does not reference any particular FINRA rule or disclosure from the checklist requiring Kersh to disclose any of this specific information.

Neither party points to any rule that specifically requires an arbitrator to disclose the information Morgan Stanley contends should have been disclosed. This is especially true regarding Kersh's failure to disclose that Childs and Harvey are his sons-in-law. Although FINRA rules suggest that an arbitrator consider his or her sons-in-law or daughters-in-law when responding to questions and making disclosures, there is no rule expressly requiring an arbitrator to make such a disclosure about in-laws (e.g., an arbitrator's son-in-law works for the defendant). Instead, the general rules of disclosure under FINRA as well as the Code of Civil Procedure govern these disclosures. Among other requirements, these rules and code sections dictate that an arbitrator disclose

18

relationships that may affect his or her impartiality or might reasonably create an appearance of partiality or bias. (See § 1281.9, subd. (a); FINRA rule 13408(a)(2).)

Here, the thrust of Morgan Stanley's argument is that Kersh's failure to disclose prevented it from discovering "a long and involved business and family relationship with Mr. Childs, a [Morgan Stanley] financial advisor." Morgan Stanley buttresses its point by claiming had Kersh "made *even one* of the many disclosures linking him to Mr. Childs, Ms. Childs, Ms. Childs' [Morgan Stanley] accounts, or Mr. Harvey, [Morgan Stanley] would have been rightfully provided the opportunity to discover at the outset of arbitration the deep-seeded vitriol surrounding Mr. Kersh's family relations and their connection to [Morgan Stanley]." (Original italics.) To this end, Morgan Stanley views each failed disclosure as a critical link in the chain between Kersh and Childs, with any one of those links providing the necessary information for Morgan Stanley to have the opportunity to discover the strained relationship.

Morgan Stanley also explains why Kersh's failure to disclose these facts would cause a reasonable observer to question Kersh's impartiality. Morgan Stanley recruited away Kersh's son-in-law, Childs; Kersh and Childs worked together for a decade; when Childs left to join Morgan Stanley, he took clients with him, causing Kersh financial impairment; and Morgan Stanley attempted to recruit Kersh's other son-in-law who almost left Kersh's firm to join Morgan Stanley as well. In discussing these facts underlying Kersh's alleged potential bias, Morgan Stanley emphasizes the familial relationship between Kersh and his sons-in-law who also worked with Kersh. However, the son-in-law relationship is not the critical link between either Kersh and Childs or

19

Kersh and Harvey supporting Morgan Stanley's claim of the appearance of bias. Instead, it is Morgan Stanley's acts of recruiting Kersh's coworkers (Childs and Harvey), one of them successfully, and the effects of that employee's subsequent departure. In other words, the potential bias Morgan Stanley claims exists absent any familial relationship between Kersh and Childs or Kersh and Harvey. Put differently, the possible impartiality stems from Morgan Stanley's recruiting efforts of Southwest employees, where Kersh serves as the branch manager.

Although Morgan Stanley's claim of the appearance of bias largely rests on the impact of Childs leaving Southwest for Morgan Stanley as well as Morgan Stanley's unsuccessful recruitment of Harvey, the parties mostly focus on Morgan Stanley's knowledge or lack thereof that Kersh was the father-in-law of both Childs and Harvey. Appellants submitted three declarations from former Morgan Stanley employees supporting their position that Morgan Stanley was aware of Kersh's relationship to Childs and Harvey prior to the arbitration. In response, Morgan Stanley submitted two declarations from current Morgan Stanley employees claiming they did not know of any such relationships. The superior court found the three declarations submitted by Appellants less credible at least in regard to Morgan Stanley's knowledge that Kersh was Child's and Harvey's father-in-law. Putting aside for the moment that it seems highly unlikely that Morgan Stanley employees who were tasked with recruiting new talent would be unaware of the reasons potential employees were looking to leave their current

20

employers, Morgan Stanley possessed the necessary knowledge to probe any potential bias that existed simply based on its recruitment of Childs and Harvey.[5]

It is undisputed that Kersh disclosed he worked as the senior vice president and branch manager of M.L. Stern & Co., Inc. from 1980 to December 2008 and the senior vice president and branch manager of Southwest from December 2008 to present. Morgan Stanley submitted the declaration of Kremers wherein he admitted that he was involved in the recruitment of both Childs and Harvey from Southwest. In addition, another declarant for Morgan Stanley (Melton) stated he was involved with recruiting Childs from Southwest and was aware that Childs "had a relative that he worked with at Southwest, and that Mr. Childs would be breaking off that relationship to join [Morgan Stanley.]" Kremers and Melton were key witnesses in Appellants' arbitration. Thus, prior to the arbitration, Morgan Stanley was aware that Kersh had worked with Childs and Harvey, Morgan Stanley had recruited Childs and Harvey to leave Southwest, and Childs joined Morgan Stanley possibly causing financial harm to Kersh. (See *Triple A Management Co. v. Frisone* (1999) 69 Cal.App.4th 520, 535; *Columbia Pictures Corp. v.*

---

5 We do not make any credibility determination regarding the various declarations submitted to the superior court. Further, the superior court was within its discretion to find some declarations more credible than others. However, the record makes clear that at the time Morgan Stanley was recruiting Childs and Harvey, at least some employees at Morgan Stanley were aware of Kersh's relationship with Childs, just not perhaps Kremers and Melton. Thus, Morgan Stanley's argument that it lacked knowledge of the familial relationship between Kersh and Childs is one of degree: Some Morgan Stanley employees had knowledge of the relationships, but not the "important" employees who would charge Morgan Stanley with such knowledge. Despite finding Morgan Stanley's argument somewhat implausible, we do not base any of our opinion here on a finding that Morgan Stanley had knowledge that Kersh was either Childs's or Harvey's father-in-law. To the contrary, we assume it did not have this knowledge for purposes of our analysis.

21

*De Toth* (1948) 87 Cal.App.2d 620, 630.)  Despite this knowledge, Morgan Stanley did not think it necessary to further inquire about Kersh's feelings toward or relationship with Morgan Stanley in an arbitration regarding Morgan Stanley's recruitment practices.  In this sense, Morgan Stanley's postarbitration claim that Kersh concealed and failed to disclose pertinent facts, which denied Morgan Stanley the opportunity to further investigate Kersh, rings hollow.  Indeed, if we are to take Morgan Stanley at its word, this one link between Childs and Kersh (Morgan Stanley's successful recruitment of Childs away from Southwest) is enough to provide it with the opportunity to investigate the relationship between Kersh and Childs.

Because we conclude Morgan Stanley knew that it recruited (one successfully) two employees from Southwest and Kersh disclosed that he was the branch manager of Southwest during the subject time period, Kersh's failure to disclose that Morgan Stanley recruited two of Southwest's employees does not justify vacating the arbitrator's award here.  (See *Mt. Holyoke Homes, L.P. v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299, 1313 (*Mt. Holyoke*); *Kaiser Foundation Hospitals, Inc. v. Superior Court* (1993) 19 Cal.App.4th 513, 517 (*Kaiser*).)  Therefore, Morgan Stanley's claims regarding Kersh's failure to disclose certain facts is reduced to not disclosing his familial relationship with Childs and Harvey, his poor relationship with Childs, and the divorce proceedings between Childs and Mandy.

We do not conclude that Kersh's failure to disclose any of these facts supports the superior court's order vacating the arbitration award.  Morgan Stanley did not sufficiently address why the familial relationship between Kersh on one hand and Harvey and Childs

22

on the other would create a reasonable belief that Kersh " 'was biased *for or against a party for a particular reason*.' [Citation.]" (*Haworth*, *supra*, 50 Cal.4th at p. 389, original italics.) The fact that Kersh was the father-in-law to both Harvey and Childs does not predispose Kersh to favor or disfavor Morgan Stanley. Indeed, Morgan Stanley makes no argument of perceived bias based on these relationships alone. Instead, Morgan Stanley contends a person could reasonably believe that Kersh would be biased against Morgan Stanley because of the financial impact on Kersh caused by Morgan Stanley's recruitment efforts. Thus, the critical fact is that Morgan Stanley recruited two of Kersh's coworkers, a fact actually known to Morgan Stanley before the subject arbitration.

In addition, we are not persuaded that Kersh's failure to disclose his turbulent relationship with Childs or the divorce proceedings involving Childs and Mandy would lead a " 'reasonable person' " who is a " 'well-informed thoughtful observer' " to doubt Kersh's impartiality. (See *Haworth*, *supra*, 50 Cal.4th at p. 389.) Childs and Kersh's strained relationship and the impending divorce do not create the impression that Kersh would be biased against Morgan Stanley in the subject arbitration. We do not deem it reasonable that an arbitrator would be biased against a large business entity merely because his son-in-law, with whom he has an acrimonious relationship, works for the entity and is getting a divorce from the arbitrator's daughter. This is especially true in the context of a FINRA arbitration where the subject arbitrator is the industry insider and would depend on his reputation within the industry for future work. In fact, the record makes clear that Morgan Stanley agreed to use Kersh in three other arbitrations, one of

23

which also involved Morgan Stanley's recruiting practices and resulted in an award largely in Morgan Stanley's favor. It is counterintuitive and speculative that Kersh would jeopardize his role as an arbitrator within a specific industry simply because he feels ill will toward his son-in-law who works at another brokerage firm.

Moreover, Childs had nothing to do with the subject arbitration. He was not a witness. He played no role in the recruitment of Appellants. Morgan Stanley tries to bridge this gap by contending that Childs was recruited by Morgan Stanley and the Appellants' arbitration involved Morgan Stanley's recruiting practices. Nevertheless, Morgan Stanley glosses over the fact that it knew that it recruited Childs away from Kersh and Southwest prior to the arbitration. In other words, if Morgan Stanley believed Kersh could not be impartial because it had recruited two of his coworkers, it could have asked Kersh to provide additional information or not agreed to allow Kersh to serve as an arbitrator. Yet, Morgan Stanley took no such action and allowed Kersh to serve in another arbitration also involving Morgan Stanley's recruiting practices.

Morgan Stanley also argues that Kersh used the information he gained during the arbitration to disadvantage Childs in his divorce proceeding with Kersh's daughter. Specifically, Morgan Stanley offered evidence that Kersh confronted Childs at Childs's son's play, demanding that Childs provide Kersh with a copy of documentation he signed on December 16, 2010 related to his transition to Morgan Stanley and saying he knew "a lot about these deals, more than you may know about them." The superior court did not rely on this evidence in its order, and Morgan Stanley fails to explain how this evidence relates to a perception of bias on behalf of Kersh. At best, the evidence perhaps could

24

show actual bias against Childs. However, we remain unpersuaded that Kersh's poor relationship with Childs would lead a reasonable observer to believe Kersh would be impartial as to Morgan Stanley.

We also are not swayed by Morgan Stanley's reliance on *Mt. Holyoke*, *supra*, 219 Cal.App.4th 1299, *Benjamin, Weill & Mazer v. Kors* (2011) 195 Cal.App.4th 40 (*Kors*), or *Ovitz v. Schulman* (2005) 133 Cal.App.4th 830 (*Ovitz*). All three cases are distinguishable from the instant matter.

In *Mt. Holyoke*, *supra*, 219 Cal.App.4th 1299, the plaintiff was suing a law firm for malpractice, and the arbitrator decided against the plaintiff. The Court of Appeal concluded the arbitration award should have been vacated because the arbitrator failed to disclose that he listed a named partner of the defendant law firm as a reference. The court reasoned that "[a]n objective observer reasonably could conclude that an arbitrator listing a prominent litigator as a reference on his resume would be reluctant to rule against the law firm in which that attorney is a partner as a defendant in a legal malpractice action." (*Id*. at p. 1313.) The court thus determined that a reasonable observer could be concerned "whether the arbitrator's interest in maintaining the attorney's high opinion of him could color his judgment in these circumstances." (*Ibid*.) Here, there are no analogous facts. In *Mt. Holyoke*, the arbitrator could have been motivated to side with the law firm with the hope that the "prominent litigator" would continue to serve as his reference, and as such, the arbitrator would obtain additional business based, at least in part, on the litigator's reference. To the contrary, in the instant matter, there is no such financial motivation for Kersh to curry favor with any party,

25

especially Appellants. Further, although Kersh clearly did not get along with Childs, there is nothing in the record leading us to conclude that an observer could reasonably believe that this animosity would transfer to Morgan Stanley based on Kersh's relationship with Childs alone.

Like *Mt. Holyoke*, *supra*, 219 Cal.App.4th 1299, neither *Kors*, *supra*, 195 Cal.App.4th 40 nor *Ovitz, supra*, 133 Cal.App.4th 830 is instructive here. In *Kors*, the Court of Appeal agreed that "an objective person could reasonably question the impartiality of an arbitrator in a dispute over legal fees who, at the time of the arbitration, was engaged generally in the defense of attorneys and law firms in cases involving professional responsibility and was actively representing a law firm in a case before the California Supreme Court involving legal fees." (*Kors*, *supra*, at p. 72.) In *Ovitz*, the arbitration award was vacated because the arbitrator did not disclose that while the arbitration was pending, he would entertain offers of employment or new professional relationships in any capacity other than as a lawyer, expert witness, or consultant from a party or a lawyer from a party, including offers to serve as a dispute resolution neutral in another case. And during the subject arbitration, the arbitrator accepted employment as an arbitrator in another case, which involved the same law firm that represented one of the parties in the subject arbitration. (*Ovitz*, *supra*, at pp. 838-839, 844-845.) In the instant matter, again no analogous facts exist. The undisclosed facts here relate to the arbitrator's familial relationship with a Morgan Stanley employee and his enmity toward him. There is no financial link between Childs and Kersh like the ones involved in *Kors*, *supra*, 195 Cal.App.4th 40 or *Ovitz, supra*, 133 Cal.App.4th 830. Further, Morgan

26

Stanley was aware that it recruited Childs away from working with Kersh, which could have had a negative financial impact on Kersh regardless of his familial relationship with Childs. However, because this fact was known to Morgan Stanley, there was no need for Kersh to disclose it. (See *Mt. Holyoke*, *supra*, 219 Cal.App.4th at p. 1313; *Kaiser*, *supra*, 19 Cal.App.4th at p. 517.)

## D. Conclusion

We emphasize the unique facts of this case. Accepting the superior court's factual findings of the disputed facts, we agree with the court that Kersh failed to completely disclose required information in response to question Nos. 8 and 17 of the checklist required under FINRA rules. However, his failure to disclose that his daughter worked with him in some capacity nearly 10 years before the subject arbitration as well as his daughter's investment accounts with Morgan Stanley would not lead a reasonable observer to perceive Kersh could not be impartial toward Morgan Stanley in the subject arbitration. (See *Haworth*, *supra*, 50 Cal.4th at p. 389.) As such, we disagree with the superior court that these undisclosed facts warrant the vacatur of the arbitration award under section 1286.2, subdivision (a)(6).

We agree with Morgan Stanley that a reasonable observer could be concerned about an appearance of bias based on Morgan Stanley's effort to recruit two of Kersh's coworkers, especially if one of the coworkers left Kersh's firm negatively impacting Kersh's finances. In this matter, it would have been prudent for Kersh to disclose these facts, particularly in an arbitration involving Morgan Stanley's recruiting activities. Yet, his failure to do so does not justify vacating the arbitration award because it is clear on

27

the record before us that Morgan Stanley was aware, prior to the arbitration that: (1) it successfully recruited Childs from Southwest; (2) it attempted to recruit Harvey from Southwest; and (3) Kersh was the branch manager of Southwest when Morgan Stanley was recruiting both Childs and Harvey. Because Morgan Stanley had actual knowledge of these facts, Kersh did not have to disclose them. (See *Mt. Holyoke*, *supra*, 219 Cal.App.4th at p. 1313; *Kaiser*, *supra*, 19 Cal.App.4th at p. 517.)

Finally, we determine that Kersh's failure to disclose he was the father-in-law of both Childs and Harvey, his hostility toward Childs, and Childs and Mandy were getting a divorce, would not cause a reasonable observer to view Kersh as potentially biased against Morgan Stanley. Neither Harvey nor Childs were involved in the subject arbitration in any way. And we conclude it is speculative that Kersh's acrimony toward Childs would transfer to Morgan Stanley during the arbitration.

As our Supreme Court noted:

> "There are many reasons why a party might, reasonably or unreasonably, prefer not to have a particular arbitrator hear his or her case--including the arbitrator's prior experience, competence, and attitudes and viewpoints on a variety of matters. The disclosure requirements, however, are intended only to ensure the impartiality of the neutral arbitrator. [Citation.] They are not intended to mandate disclosure of all matters that a party might wish to consider in deciding whether to oppose or accept the selection of an arbitrator." (*Haworth*, *supra*, 50 Cal.4th at p. 393; see also *Luce, Forward, Hamilton & Scripps, LLP v. Koch* (2008) 162 Cal.App.4th 720, 734-735 [neutral arbitrator not legally required to disclose service on board of professional organization with plaintiff's counsel, even if defendants asserted they were " 'understandably uncomfortable' " with that relationship].)

28

Here, Morgan Stanley might have wanted to know of the relationship between Kersh and Childs, but we do not find that Kersh's failure to disclose this relationship deprived Morgan Stanley of the opportunity to consider Kersh as an arbitrator with knowledge of the pertinent facts. Ultimately, Morgan Stanley did not take issue with Kersh serving as an arbitrator in a case involving Morgan Stanley's recruiting practices although it was aware it had recruited two of Kersh's coworkers (one successfully). Its postarbitration award contention that Kersh's failure to disclose certain facts, namely his familial relationship with Childs, warrants vacatur of the arbitration award is without merit.

Because we reverse the superior court's order vacating the arbitration award, we do not reach Appellants' appeal of the order denying its motion for reconsideration.

DISPOSITION

The order vacating the arbitration is reversed and remanded with directions for the superior court to enter an order confirming the arbitration award. Appellants are awarded their costs of this appeal.

HUFFMAN, Acting P. J.

WE CONCUR:


McINTYRE, J.

AARON, J.

29